**BEFORE THE UNITED STATES
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

IN RE: CERTAIN UNDERWRITERS AT
LLOYD'S, LONDON COVID-19 BUSINESS
INTERRUPTION PROTECTION             MDL No. 2961
INSURANCE LITIGATION
_____/

**RESPONSE TO THE PANEL'S ORDER TO
SHOW CAUSE IN SUPPORT OF CENTRALIZATION**

El Novillo Restaurant d/b/a DJJ Restaurant Corp. and El Novillo Restaurant d/b/a Triad Restaurant Corp., plaintiffs in *El Novillo Restaurant v. Certain Underwriters at Lloyd's, London*, No. 1:20-cv-21575 (S.D. Fla.), and Sun Cuisine LLC, plaintiff in *Sun Cuisine LLC v. Certain Underwriters at Lloyd's, London*, No. 1:20-cv-21827 (S.D. Fla.), support centralization in the Southern District of Florida of the fourteen actions included on Schedule A of the Panel's Show Cause Order (the "Lloyd's Cases"), as well as any potential tag-along cases, for the reasons set forth below.

**INTRODUCTION**

Plaintiffs in the Lloyd's Cases purchased business interruption coverage from Lloyd's of London and its affiliated companies, HDI Global Specialty SE and DTW 1991 Underwriting Limited (together, "Lloyd's"). All Plaintiffs have filed claims against that coverage for business income losses resulting from the COVID-19 pandemic. Business income coverage is commonly provided in a standard ISO form, which offers general coverage for business income losses resulting from a suspension of business operations caused by "direct physical loss of," "direct physical loss to," or "damage to" covered property. The same form also provides coverage for business income losses resulting from "civil authority" orders prohibiting access to covered property.

1

Lloyd's uses different versions of the same standard form in different policies—Plaintiffs here have forms issued in 2001, 2007, and 2011—but all versions use the same or substantially similar coverage language and identical defined terms. Policies composed of these standard forms also incorporate form exclusions. The exclusions Lloyd's has raised in these cases—the Microorganism Exclusion, two pollution exclusions, and the Mold, Mildew or Other Fungi Exclusion—appear in different combinations in the various policies, but are identical across all policies where they appear.

The Lloyd's Cases are ideally suited for consolidation and transfer. The cases present common factual issues: Plaintiffs purchased Lloyd's policies based on standard ISO forms, seek coverage under the same provisions, and suffered losses of business income because the global COVID-19 pandemic and local "stay at home" orders required them to close or limit their operations. These common factual issues give rise to common legal questions, including whether Lloyd's standard business interruption and civil authority forms cover business income losses caused by the global COVID-19 pandemic, and whether Lloyd's standard exclusions preclude recovery.

Resolution of the first question turns on the application of commo facts to the interpretation of three phrases—"physical loss of," "physical loss to," and "damage to" property. A ruling from the MDL court as to whether the COVID-19 pandemic caused "physical loss of," "physical loss to," and "damage to" covered property will determine business income coverage for all Plaintiffs in one stroke. The same phrases are critical to the civil authority provisions, which present subsidiary questions—*e.g.*, whether COVID-19 created a "dangerous physical condition"—which are also common to all Plaintiffs. Uncommon questions—such as whether particular state and municipal civil authority orders "prohibited access" to covered property—are also best answered

with one voice. These questions may turn to some extent on common issues, and the resolution of all common and uncommon questions by one judge will allow the just and expeditious resolution of all actions to the overall benefit of the parties.

The second question—whether Plaintiffs' losses are excluded from coverage—similarly lends itself to common resolution. Each exclusion follows the same form, and the individual exclusions are identical across policies. The court's analysis of these exclusions, therefore, will apply with equal force to all Plaintiffs whose policies include them. To the extent that additional exclusions arise in future-filed cases, an MDL transferee court would be best-suited to address them as well.

Finally, the Panel should transfer the Lloyd's cases to the Southern District of Florida for centralized proceedings for several reasons. First, centralization in the Southern District of Florida will serve the convenience of the parties. Five of the fourteen related cases were filed in the Southern District of Florida. Plaintiffs in a sixth case, filed in the Southern District of New York, operate their two businesses in the Southern District of Florida. A seventh case is pending nearby in the Middle District of Florida. Second, South Florida has been particularly hard hit by the pandemic, as the region is a pandemic "hot-spot" which relies on tourism, and specifically restaurants and hotels, to fuel its economy. These businesses are the typical "non-essential" businesses forced to close due to the pandemic. Third, docket conditions in the Southern District of Florida are particularly favorable for an MDL, and the judges there are exceptionally qualified and experienced with MDL litigation.

The Panel should centralize the Lloyd's Cases and transfer them to the Southern District of Florida.

**BACKGROUND**

Plaintiffs in the related Lloyd's Cases are business owners who lost income as a result of the COVID-19 pandemic. Their losses arose from the pandemic itself—as customers were advised to stay at home and avoid traveling, dining out, and gathering in large groups—and from state and municipal emergency "stay at home" orders. These "stay at home" orders are similar in substance: they required "non-essential" businesses like restaurants and hotels to close their doors to customers, and either cease operations altogether or limit their businesses to takeout and delivery service.

All plaintiffs in the Lloyd's Cases hold "all-risk" insurance policies based on standard ISO forms designated with prefixes "CP 00 10" and "CP 00 30." These forms provide coverage for business income losses sustained due to the suspension of the insured's business operations resulting from a Covered Cause of Loss, and for losses arising from civil authority orders that prohibit access to covered property. Covered Cause of Loss has one definition across all policies, as do all other relevant defined terms. Though slight variations in language exist among the relevant coverage provisions, each provision comes from one of a few standard forms. The relevant coverage provisions and exclusions are set forth below.

**Business Income Coverage**

Eleven of the fourteen Plaintiffs in the Lloyd's Cases have Business Income (and Extra Expense) Coverage Forms designated with the prefix "CP 00 30."[1] These policies provide:

---

[1] Ten of these eleven policies were attached to complaints or motions to dismiss in the Lloyd's Cases. *See El Novillo Restaurant v. Certain Underwriters at Lloyd's, London*, No. 1:20-cv-21525 (S.D. Fla.) [D.E. 24-2]; *Sun Cuisine LLC v. Certain Underwriters at Lloyd's, London*, No. 1:20-cv-21827 (S.D. Fla.) [D.E. 1-1]; *Atma Beauty, Inc. v. HDI Global Specialty SE*, 1:20-cv-21745 (S.D. Fla.) [D.E. 4-1]; *Runway 84, Inc. v. Certain Underwriters at Lloyd's, London*, No. 0:20-cv-61161 (S.D. Fla. [D.E. 1-1]; *SA Palm Beach LLC v. Certain Underwriters at Lloyd's, London*, No. 9:20-cv-80677 (S.D. Fla.) [D.E. 14-1]; *Station 6, LLC v. Certain Underwriters at Lloyd's, London*,

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by ***direct physical loss of or damage to*** property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

(Emphasis added).

Two of the remaining four Plaintiffs have "Vacation Rental Business Income Coverage," which follows the standard ISO form and provides:

> We will pay for the actual loss of "Business Income" you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by ***direct physical loss to*** property at the described premises, including personal property in the open (or in a vehicle) within 100 feet, caused by or resulting from any Covered Cause of Loss.

*See MDH Global. LLC v. Certain Underwriters at Lloyd's, London*, No. 3:20-cv-8214 (D.N.J.) [D.E. 1-5] at 19 (emphasis added); *Palm & Pine Ventures, LLC v. Certain Underwriters at Lloyd's, London*, No. 3:20-cv-8212 (D.N.J.) [D.E. 1] ¶¶ 14, 17-23.

"Direct physical loss of," "direct physical loss to," and "damage to" property are undefined in all Plaintiffs' policies.

All thirteen policies afford "Covered Cause of Loss" the same meaning. In all cases,

---

No. 2:20-cv-1371 (E.D. La.) [D.E. 11-2]; *Gio Pizzeria & Bar Hospitality, LLC v. Certain Underwriters at Lloyd's, London*, No. 1:20-cv-3107 (S.D.N.Y.) [D.E. 1-1]; *632 Metacom, Inc. v. Certain Underwriters at Lloyd's, London*, No. 1:20-cv-3905 (S.D.N.Y.) [D.E. 1-1]; *Independence Restaurant Grp., LLC v. v. Certain Underwriters at Lloyd's, London*, No. 2:20-cv-2365 (E.D. Pa.) [D.E. 1-1]; *Prime Time Sports Grill, Inc. v. DTW 1991 Underwriting Ltd.*, No. 8:20-cv-771 (M.D. Fla.) [D.E. 6-1]. The eleventh, the policy in *Fire Island Retreat v. Certain Underwriters at Lloyd's, London*, No. 20-cv-2312 (E.D. Pa.), was not available on the docket. The complaint in that case, however, bring claims based on the plaintiffs' business income and civil authority coverage, and uses terms common to the standard forms (e.g., "direct physical loss of," "suspension of operations,"). For purposes of this response, the El Novillo and Sun Cuisine Plaintiffs assume the policy incorporates the standard forms. If it does not, the El Novillo and Sun Cuisine Plaintiffs will address the *Fire Island Retreat* policy in their reply.

"Covered Cause of Loss" means "direct physical loss" unless the loss is excluded or limited in the policy. Eleven of the policies define "suspension" to mean "[t]he slowdown *or* cessation of your business activities." The Vacation Rental policies leave "suspension" undefined. The definition of "period of restoration" is materially the same across all policies.

Plaintiffs in the fourteenth case purchased a policy with a "Pandemic Event Endorsement." *See* Complaint & Exhibit A [D.E. 1, 1-1], *RJH Mgmt. Corp. v. Certain Underwriters at Lloyd's, London*, No. 3:20-cv-3143 (C.D. Ill.). The Pandemic Event Endorsement provides coverage for business income losses arising from "the announcement by a Public Health Authority that a specific Covered Location is being closed as a result of an Epidemic declared by the CDC or WHO" or "the actual presence of an Infected Person within a Covered Location." *Id.* "Covered Diseases" under the policy include "Severe-Acute Respiratory Syndrome-associated coronavirus (SARS-CoV) disease." *Id.* Lloyd's has answered the complaint in *RJH Management Corp.* and alleged that it had agreed to process the plaintiff's claim. *See* Answer [D.E. 8], *RJH Mgmt. Corp. v. Certain Underwriters at Lloyd's, London*, No. 3:20-cv-3143 (C.D. Ill.).

## Civil Authority Coverage

Thirteen of the fourteen policies also include a provision for "Additional Coverages-Civil Authority."[2] At least six of the policies provide:

> When a Covered Cause of Loss causes ***damage to*** property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:
>
> (1) Access to the area immediately surrounding the damaged

---

[2] The plaintiffs in *RJH Management* only attached certain endorsements to their complaint. It is unclear whether their policy includes the standard forms. Regardless, the *RJH* plaintiffs have only brought claims based on the Pandemic Event Endorsement.

6

> property is prohibited by civil authority *as a result of the damage*, and the described premises are within that area but are not more than one mile from the damaged property; and
>
> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

*See El Novillo*; *Sun Cuisine*; *Runway 84*; *Atma Beauty*; *SA Palm Beach*; *Gio Pizzeria*, *supra* n.1.[3]

At least three of the policies provide:

> We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises *due to direct physical loss of or damage to property*, other than at the described premises, caused by or resulting from any Covered Cause of Loss. The coverage for Business Income will begin 72 hours after the time of that action and will apply for a period of up to three consecutive weeks after coverage begins.

*See 632 Metacom*; *Independence Restaurant Grp.*; *Station 6*; *supra* n.1.

Finally, the "Vacation Rental" policies provide:

> We will pay for the actual loss of "Business Income" you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises *due to direct physical loss to property*, other than at the described premises, caused by or resulting from any Covered Cause of Loss. This coverage will apply for a period of up to 90 consecutive days from the date of that action.

Civil authority coverage turns on the same undefined terms as business income coverage: "direct physical loss of," "direct physical loss to," and "damage to." Otherwise, all three civil authority provisions provide coverage for business income losses caused by civil authority orders prohibiting access to covered premises.

## **Exclusions**

The policies at issue set forth various exclusions, only three of which have been raised by

---

[3] Because the policy was not docketed in *Fire Island Retreat*, it is not clear which of these two civil authority provisions was included in the plaintiff's policy.

7

Lloyd's to date in these cases: (1) the Microorganism Exclusion; (2) the Mold, Mildew, or Other Fungi Exclusion; and (3) the pollution exclusions. The language of these exclusions does not vary across policies.

Policies with the Microorganism Exclusion use the same provision:

This policy does not insure any loss, damage, claim, cost, expense or other sum directly or indirectly arising out of or relating to:

mold, mildew, fungus, spores or other micro-organism of any type, nature, or description, including but not limited to any substance whose presence poses an actual or potential threat to human health.

The few policies that include the Mold, Mildew or Other Fungi Exclusion use the same form. It excludes from coverage any:

[L]oss, damage, cost, fine, penalty or expense caused directly or indirectly by, arising out of, in connection with, resulting from, contributed to or related in any way by exposure to or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence or growth of mold, mildew, mycotoxins, fungi or organic pathogens. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage.

"Organic pathogen" is defined in the form to include "any organic irritant or contaminant" including "mold, fungus, bacteria, or virus."

Policies including pollution exclusions invariably use forms designated NMA 2340 and NMA 2342. The exclusions in both forms are identical, and exclude from coverage:

[A]ny loss, damage, cost or expense . . . which arises from any kind of seepage or any kind of pollution and/ or contamination, or threat thereof, whether or not caused by or resulting from a Peril insured, or from steps or measures taken in connection with the avoidance, prevention, abatement, mitigation, remediation, clean-up or removal of such seepage or pollution and/ or contamination or threat thereof.[4]

---

[4] Both forms define "any kind of seepage or any kind of pollution and/ or contamination" to include:

(a) seepage of, or pollution and/ or contamination by, anything, including but not limited to, any material designated as 'hazardous material by the United States Environmental Protection Agency or as a 'hazardous material by the United States Department of Transportation, or defined as a 'toxic substance by the Canadian Environmental Protection Act for the purposes of Part II of that

8

Lloyd's has also invoked a second pollution exclusion, which is common to all policies, and excludes claims arising from the "[d]ischarge, dispersal, seepage, migration, release or escape of 'pollutants' unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the 'specified causes of loss.'"

## Procedural History

The fourteen related cases are pending in seven judicial districts. Five cases are pending in the Southern District of Florida; two each in the Southern District of New York, the Eastern District of Pennsylvania and the District of New Jersey; and one each in the Middle District of Florida, the Eastern District of Louisiana, and the Central District of Illinois. None of the fourteen cases has proceeded past responses to the complaint. Motions to dismiss are pending, but not yet resolved, in eight of the fourteen cases. Responsive pleadings or motions have not yet been filed in five cases. One case is stayed pending resolution of these proceedings. Finally, in one case, Lloyd's has answered the complaint.

On August 12, 2020, the Panel ordered the parties to show cause why the Lloyd's Cases should not be transferred to a single district for consolidated or coordinated pretrial proceedings under 28 U.S.C. § 1407. [D.E. 3.] The El Novillo and Sun Cuisine Plaintiffs now respond in support of centralization in the Southern District of Florida.

## ARGUMENT

### I. THE LLOYD'S CASES ARE IDEALLY SUITED FOR CENTRALIZATION.

Centralization of the Lloyd's cases will create efficiencies that neither the parties nor the

---

Act, or any substance designated or defined as toxic, dangerous, hazardous or deleterious to persons or the environment under any other Federal, State, Provincial, Municipal or other law, ordinance or regulation; and (b) the presence, existence, or release of anything which endangers or threatens to endanger the health, safety or welfare of persons or the environment.

9

eleven district court judges presiding in seven different jurisdictions, as well as the inevitable and anticipated avalanche of tag-along cases, can reasonably achieve on their own, by empowering a transferee judge to streamline pretrial litigation and synchronize proceedings on common and non-common issues. Such efficiencies will be easily achieved because the facts giving rise to the plaintiffs' losses and the relevant policy provisions are materially the same. All plaintiffs in the Lloyd's Cases suffered losses arising from a global pandemic, and were subject to "civil authority" orders closing or restricting their business operations. Plaintiffs in thirteen of the Lloyd's Cases purchased coverage for business interruption losses arising from the "direct physical loss of," "direct physical loss to," or "damage to" covered property. These same policies provide additional civil authority coverage for business income losses caused by government orders prohibiting access to covered property because of the "direct physical loss of," "direct physical loss to," or "damage to" other property. Discovery and pretrial motions will focus in large part on the interpretation of these three terms, and their application to common facts.

Discovery and pretrial motion practice will also turn on the policy exclusions. To date, Lloyd's contends that only three standard exclusions apply, and the language of these exclusions is identical across all policies that include them. As with the coverage determination, discovery and pretrial motion practice will address a limited set of questions, including whether a virus is a "micro-organism," a "pollutant," or a "contaminant"; and whether a "micro-organism," a "pollutant," a "contaminant," or an "organic pathogen" must be present on covered premises in order for business income losses to be excluded.

Non-common questions will arise. The transferee court may, for example, consider whether various state and municipal "stay at home" orders prohibited access to covered premises. These questions, too, however, may turn to some extent on common language. The court would need to

determine, for example, what constitutes a "prohibition of access" before reviewing civil authority order to assess their impact. It is also likely that new cases against Lloyd's will arise, presenting coverage provisions or exclusions not included in the standard forms (like the Pandemic Event Exclusion). To the extent that uncommon issues must be addressed, "Section 1407 does not require a complete identity or even a majority of common factual issues as a prerequisite to centralization." *In re Zimmer Durom Hip Cup Prods. Liab. Litig.*, 717 F. Supp. 2d 1356, 1358 (J.P.M.L. 2010) (citation omitted); *see also In re Merscorp., Inc. RESPA Litig.*, 560 F. Supp. 2d 1371, 1372 (J.P.M.L. 2008) ("Transfer under Section 1407 … does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer.") (citation omitted). As the Panel has explained:

> Transfer under Section 1407 has the salutary effect of placing all actions before a single judge who can formulate a pretrial program that: 1) allows discovery with respect to any non-common issues to proceed concurrently with discovery on common issues ... and 2) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties.

*In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 398 F. Supp. 2d 1356, 1358 (J.P.M.L. 2005) (internal citation omitted). "The transferee court can employ any number of pretrial techniques—such as establishing separate discovery and/or motion tracks—to efficiently manage th[e] litigation." *Id.*

Finally, the procedural postures of the Lloyd's Cases are substantially similar. All fourteen of the Lloyd's cases were filed in the past five months, and none has proceeded past responsive motions or pleadings. If any discovery has been served, it is in its nascent stages. All parties will benefit from common discovery and pretrial proceedings on the questions arising from Lloyd's common policies. *See, e.g., In re Lowe's Companies, Inc., Fair Labor Standards Act & Wage & Hour Litig.*, No. MDL 2947, 2020 WL 4670702, at *2 (J.P.M.L. Aug. 5, 2020) ("All actions remain

at a relatively early stage of pretrial proceedings, . . . and will benefit from common discovery as to the company-wide conduct alleged by plaintiffs.").

The Panel should centralize the Lloyd's Cases.

## II. THE PANEL SHOULD CENTRALIZE THE LLOYD'S CASES IN THE SOUTHERN DISTRICT OF FLORIDA.

In selecting an MDL location, the Panel considers each proposed district's nexus to the litigation, as well as factors including the available district court's docket conditions and the district's accessibility. *See In re Veeco Instruments, Inc. Sec. Litig.*, 387 F. Supp. 2d 1365, 1366 (J.P.M.L. 2005). Here, these factors support transfer to the Southern District of Florida.

### A. The Southern District of Florida Has the Strongest Nexus to the Lloyd's Business Interruption Litigation.

Of the five districts represented, the Southern District of Florida has the strongest nexus to the related cases. First, more cases against Lloyd's ae pending in the Southern District of Florida than in any other district. Five of the fourteen cases are pending in the Southern District of Florida.[5] And in a sixth case, pending in the Southern District of New York, both plaintiffs have their principal places of business in the Southern District of Florida. *See* Amended Complaint [D.E. 16] ¶¶ 1, 19, 20, *Gio Pizzeria & Bar Hospitality, LLC v. Certain Underwriters at Lloyd's London*, No. 1:20-cv-3107 (S.D.N.Y.). The other judicial districts with cases pending have one or two each. *See* Order to Show Cause at 2.

Second, South Florida's economy has been particularly hard hit by the COVID-19 pandemic, in large part because its economy relies on the tourism, hospitality, and service

---

[5] *See El Novillo Restaurants v. Certain Underwriters at Lloyd's, London*, No. 1:20-cv-21575 (S.D. Fla.); *Atma Beauty, Inc. v. HDI Global Specialty SE*, No. 1:20-cv-21745 (S.D. Fla.); *Runway 84, Inc. v. Certain Underwriters at Lloyd's, London*, No. 0:20-cv-61161 (S.D. Fla.); *Sun Cuisine, LLC v. Certain Underwriters at Lloyd's, London*, No. 1:20-cv-21827 (S.D. Fla.); *SA Palm Beach, LLC v. Certain Underwriters at Lloyd's, London*, No. 9:20-cv-80677 (S.D. Fla.).

industries. According to the Department of Labor Statistics, Florida has the third-highest concentration of hospitality jobs in the nation,[6] and is the second-most visited state in terms of tourism.[7] In Florida, hospitality is a $111.7 billion industry,[8] and locals depend on tourists to fill the state's 4,583 hotels[9] and 41,366 restaurants.[10]

In the first three quarters of 2019, more than 100 million tourists visited Florida.[11] Prior to the COVID-19 pandemic, the Florida tourism industry was on a continuous streak of growth, with the total number of annual visitors breaking the previous record every year since at least 2010.[12] In 2017 alone, Florida took in $88.6 billion in out-of-state tourism spending.[13] A high

---

[6] The only states with larger shares in the hospitality industry are California and Texas. Derived from Department of Labor, Bureau of Labor Statistics, Employment by Sector, Leisure and Hospitality, current to March 2020, data.bls.gov.

[7] *The Most Visited States in the U.S.*, WORLD ATLAS, https://www.worldatlas.com/articles/the-most-visited-states-in-the-us.html (last visited April 23, 2020.

[8] FLORIDA RESTAURANT & LODGING ASSOCIATION, https://frla.org/about/ (last visited April 23, 2020)

[9] VISIT FLORIDA, FREQUENTLY ASKED QUESTIONS, https://www.visitflorida.org/resources/research/research-faq/ (last visited April 23, 2020).

[10] NATIONAL RESTAURANT ASSOCIATION, FLORIDA RESTAURANT INDUSTRY AT A GLANCE (2019), https://restaurant.org/Downloads/PDFs/State-Statistics/florida.pdf

[11] VISIT FLORIDA, ESTIMATES OF VISITORS TO FLORIDA BY QUARTER, visitflorida.org/resources/research (last visited April 23, 2020).

[12] Adam Leposa, *Stats: Record 126.1 Million Visitors to Florida in 2018*, Travel Agent Central, Feb. 25, 2019, https://www.travelagentcentral.com/running-your-business/stats-record-126-1-million-visitors-to-florida-2018.

[13] This includes $24.3 billion in lodging, $20.2 billion in food and beverage, $15 billion in shopping, $18 billion in transportation, and $11.3 billion in entertainment and recreation. A Banner Year for Florida Tourism Performance: The 2017 Contribution of Travel & Tourism to the Florida

concentration of that spending is in counties within the Southern District of Florida: $19.7 billion in Miami-Dade; $5.8 billion in Broward; $3.9 billion in Palm Beach; and $2.9 billion in Monroe.[14] Statewide, flights into Florida are down more than 65% from this time last year and international flights have been reduced by nearly 80%,[15] particularly devastating since international travelers spend significantly more money in Florida than do domestic travelers.[16]

Of the nation's top twenty-five tourism markets, the Miami/Hialeah area has suffered the steepest decline in average daily hotel room rate.[17] For the week ending April 18, 2020, Miami hotels had fallen in occupancy from 95.7% capacity in 2019 to 20.3% capacity in 2020.[18] The effects in Monroe County have been similarly drastic: for the week ending with April 18, 2020, hotels were only at 7.6% capacity, down from 99.2% during the same week in 2019.[19] So too in Broward County, where occupancy has fallen from 94.6% in 2019 to 22.5% in 2020, a drop of

---

Economy, 3, https://www.visitflorida.org/media/71465/2017-contribution-of-travel-tourism-to-the-florida-economy.pdf

[14] *Id*. at 31. Of the top-ten Florida counties by tourism spending, four are in the Southern District.

[15] Terry Spencer, *Florida Tourism Industry Plans to Ease into Reopening*, ASSOCIATED PRESS (Apr. 21, 2020), https://apnews.com/c70864a5d3f89113b945b0616d4eeed6

[16] On average, international visitors spend $1,180 on goods and services in Florida, compared to $616 spent by out-of-state domestic visitors. The Statewide Economic Impacts of Florida Seaports, Florida Ports Council, December 2016, 10, http://scdn.flaports.org/wp-content/uploads/EconomicImpactsofFloridaSeaports.pdf.

[17] Michelle Kaufman and Taylor Dolven, *South Florida Hotels Hurting More than Anywhere Else as COVID-19 Pandemic Continues*, MIAMI HERALD (APR. 22, 2020) https://www.miamiherald.com/news/business/tourism-cruises/article242178741.html

[18] *Id*.

[19] *Id*.

72.1%.[20] In comparison, the national hotel occupancy rate has fallen from 64.4% to 23.4%[21]—severe, but not nearly as severe as the decline in South Florida.

Additionally, the Port of Miami (Miami-Dade County) and Port Everglades (Broward County) are the first- and third-busiest cruise ports in the world by number of passengers.[22] The cruise industry supports approximately 140,000 jobs in Florida, for a total wage and salary income impact of approximately $2.3 billion.[23] Business derived from food, beverage, and other services related to cruise traffic added another $7.2 billion to statewide revenue.[24]

The curfew orders, capacity-reductions, and eventual closure of restaurants have decimated the food and beverage business. Nationwide, restaurant and hospitality jobs account for at least 60% of the jobs lost since the pandemic began, and jobs in food services and drinking places are down by 2.6 million since February.[25] Florida bears a disproportionate share of the burden, with the third-highest volume of food service employment in the nation.[26] The majority

---

[20] *Id*.

[21] *Id*.

[22] NAFTA Region Port Cruise Traffic 2015–2017, http://aapa.files.cms-plus.com/Statistics/CRUISE%20TRAFFIC%20NORTH%20AMERICA%202015-2017%20REVISED.pdf.

[23] FLORIDA SEAPORT TRANSPORTATION AND ECONOMIC DEVELOPMENT COUNCIL, THE STATEWIDE ECONOMIC IMPACTS OF FLORIDA SEAPORTS, 22 (DECEMBER 2016), http://scdn.flaports.org/wp-content/uploads/EconomicImpactsofFloridaSeaports.pdf

[24] *Id*.

[25] News Release, Bureau of Labor Statistics, The Employment Situation—March 2020 (Apr. 3, 2020), https://www.bls.gov/news.release/pdf/empsit.pdf; News Release, Bureau of Labor Statistics, The Employment Situation—July 2020 (Aug. 7. 2020), https://www.bls.gov/news.release/pdf/empsit.pdf.

[26] U.S. BUREAU OF LABOR STATISTICS, OCCUPATIONAL EMPLOYMENT AND WAGES (MAY 2019), https://www.bls.gov/oes/current/oes350000.htm

15

of these food service jobs are concentrated in the greater Miami-Fort Lauderdale-West Palm area, in the Southern District of Florida.[27] In 2018, the 41,366 restaurants in Florida provided approximately 1.1 million jobs, 12% of the State's employment, and took in an estimated $50 billion in sales.[28] By contrast, Pennsylvania had 26,548 restaurants in 2018 employing 580,000 people equaling 10% of Pennsylvania's employment; New York had 50,153 restaurants employing approximately 865,800 people, equaling 9% of New York's employment; Louisiana had 9,533 restaurants employing 213,400 people, equaling 11% of Louisiana's employment; Illinois had 25,488 restaurants employing 588,700 people, equaling 10% of its employment; and New Jersey had 19,050 restaurants employing 348,300 people, equaling 8% of New Jersey's employment.[29]

### B. Docket Conditions in the Southern District of Florida Are More Favorable Than in Any Other District Where a Lloyd's Case Is Pending.

The Southern District of Florida is better equipped to handle a large and complex MDL than any of the other judicial districts where cases against Lloyd's are pending.[30] The Southern District of Florida moves cases forward more efficiently than either of the other potential districts and resolves its civil cases both at a faster pace and in higher volume. For civil cases

---

[27] *Id.*

[28] NATIONAL RESTAURANT ASSOCIATION, FLORIDA RESTAURANT INDUSTRY AT A GLANCE (2019), https://restaurant.org/Downloads/PDFs/State-Statistics/florida.pdf

[29] NATIONAL RESTAURANT ASSOCIATION, STATE STATISTICS (2019), https://restaurant.org/research/state.

[30] United States District Courts—National Judicial Caseload Profile, Combined Civil and Criminal Federal Court Management Statistics (December 31, 2019), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2019.pdf.

16

in the Southern District of Florida in 2019, the median time from filing to disposition was 3.9 months and the median time from filing to trial in civil cases was 15.8 months. In the Middle District of Florida, the median time from filing to disposition was 5.7 months. The median time from filing to trial in civil cases was 22.7 months. In the Eastern District of Louisiana, the median time from filing to disposition was 7.7 months. The median time from filing to trial in civil cases was 19.2 months. In the Eastern District of Pennsylvania, the median time from filing to disposition was 6 months.  The median time from filing to trial in civil cases was 19.6 months. In the Southern District of New York, the median time from filing to disposition was 6.5 months. The median time from filing to trial in civil cases was 31.1 months. Finally, in the District of New Jersey, the median time from filing to disposition was 9.8 months. The median time from filing to trial in civil cases was 46.3 months.

The Southern District of Florida also has one of the lowest percentages of active civil cases that are more than three years old. The Southern District of Florida, a total of 113 cases, or 2.4% of the docket, are more than three years old.  In the Eastern District of Pennsylvania, a total of 1,507 cases, or 20.7% of the docket, are more than three years old.  In the Southern District of New York, a total of 2,927 cases, or 20.9% of the docket, are more than three years old. In the District of New Jersey, a total of 806 cases, or 2.1% of the docket, are more than three years old. In the Eastern District of Louisiana, a total of 14,450 cases, or 32.5% of the docket, are more than three years old. Finally, in the Middle District of Florida, a total of 393 cases, or 5.9% of the docket, are more than three years old.

The judges in the Southern District of Florida are exceptionally qualified and experienced with MDL litigation, as evidenced by the Panel's selection of the Southern District of Florida as the transferee venue in numerous largescale MDL actions including *In re Takata Airbag Products*

*Liability Litigation*, No. 15-md-2599 (S.D. Fla.) and *In re Checking Account Overdraft Litigation*, No. 09-md-2036 (S.D. Fla.). The Panel has consistently acknowledged that MDL experience is an important factor in deciding upon a transferee court. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 626 F. Supp. 2d 1346, 1347 (J.P.M.L. 2009) (finding that centralization in the chosen district permits the Panel to "effect the section 1407 assignment to a judge who has extensive experience in multidistrict litigation as well as the ability and temperament to steer this complex litigation on a steady and expeditious course"); *In re Trasylol Prods. Liab. Litig.*, 545 F. Supp. 2d 1357, 1358 (J.P.M.L. 2008) (assigning case to the Southern District of Florida and reasoning that by centralizing litigation in the Southern District of Florida, the matter would be before a district court judge with "the experience to steer this litigation on a prudent course"). Southern District of Florida judges are also well-versed in insurance litigation,[31] as South Florida is in the path of "Hurricane Alley."[32] Any of the Southern District of Florida judges who has been assigned one of the related cases, or any of the judges who may receive future tag-along actions, would be a worthy choice to handle this complex and important litigation.

---

[31] *See e.g.*, Ron Hurtibise, *Hurricane Irma powers sharp increase in lawsuits against insurers*, (May 3, 2018) https://www.sun-sentinel.com/business/fl-bz-hurricane-irma-suits-on-rise-against-insurers-20180502-story.html; *see also*, *QBE Ins. Corp. v. Dome Condo. Ass'n, Inc.*, No. 08–20906–CIV. (S.D. Fla. 2008) (involving property insurer and disputed insurance claim following hurricane.); *Townhouses of Highland Beach Condo. Ass'n, Inc. v. QBE Ins. Corp.,* No. 06–81132–CIV, (S.D. Fla. 2007) (Insured condominium association brought suit against property insurer for coinsurance provisions.); *Fabricant v. Kemper Indep. Ins. Co.*, No. 06-80527-CIV, (S.D. Fla. 2007) (Insureds brought class action against their insurer based on insurer's failure to provide loss assessment coverage.)

[32] Hurricane Alley is an area of warm water in the Atlantic Ocean stretching from the west coast of northern Africa to the east coast of Central America and Gulf Coast of the Southern United States.

## **CONCLUSION**

The Panel should centralize the Lloyd's cases in the Southern District of Florida.

Dated:  August 19, 2020.                    Respectfully submitted,

                                              **KOZYAK TROPIN & THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Tel: (305) 372-1800

By: /s/ *Harley S. Tropin*
    Harley S. Tropin, Esq.
    Florida Bar No. 241253
    hst@kttlaw.com
    Benjamin Widlanski, Esq.
    Florida Bar No.  1010644
    bwidlanski@kttlaw.com
    Gail A. McQuilkin, Esq.
    Florida Bar No. 969338
    gam@kttlaw.com
    Javier A. Lopez, Esq.
    Florida Bar No. 16727
    jal@kttlaw.com
    Rachel Sullivan, Esq.
    rs@kttlaw.com
    Florida Bar No. 815640
    Robert Neary, Esq.
    Florida Bar No. 81712
    rn@kttlaw.com

    *Counsel for El Novillo*
    *and Sun Cuisine Plaintiffs*