**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE: CERTAIN UNDERWRITER'S ) | | MDL No. 2961 |
| AT LLOYD'S, LONDON, COVID-19 ) | | |
| BUSINESS INTERRUPTION ) | | |
| PROTECTION INSURANCE LITIGATION ) | | |

**RESPONSE IN SUPPORT OF TRANSFER FOR CONSOLIDATED OR
COORDINATED PRETRIAL PROCEEDINGS IN THE
EASTERN DISTRICT OF LOUISIANA**

**MAY IT PLEASE THE COURT:**

Plaintiff, Station 6, L.L.C., supports transfer of all scheduled and subsequent actions against Certain Underwrites at Lloyd's, London (hereinafter "Lloyd's") to the Honorable Sarah S. Vance, United States District Court for the Eastern District of Louisiana.

In its invitation for briefing, this Panel specifically requested "…a better understanding of the factual commonalities and differences among these actions, as well as the efficiencies that may or may not be gained through centralization…" *See In Re COVID Business Interruption Insurance Coverage Litigation*, MDL No. 2942, R. Doc. 772 at P. 4 (J.P.M.L. 08/12/20). Factual commonalities abound and centralization provides significant efficiencies.

Judge Vance and the Eastern District of Louisiana are uniquely qualified to maximize such efficiencies as a result of their past management of: 1) Thousands of first party insurance actions following Hurricane Katrina; 2) Thousands of business interruption actions associated with the BP Oil Spill; and 3) Numerous MDLs.

**I.   Lloyd's Public COVID-19 Claim Value Estimate Is Proof of Factual Commonalities.**

From the outset of the pandemic, Lloyd's acknowledged that COVID-19 insurance claims

are a unique subset with underlying factual commonalities that allow Lloyd's to calculate its potential global exposure.

On May 14, 2020, Lloyd's, the self-described "world's leading (re)insurance market," announced that the "[t]he Lloyd's market alone is currently expected to pay claims amounting to some $4.3 billion, making it one the market's largest pay-outs ever." Lloyd's explained that "[t]his is on par with 9/11 in 2001 and the combined impact of hurricanes Harvey, Irma and Maria in 2017, all of which led to similar pay outs by the Lloyd's market. These losses could rise further if the current lockdown continues into another quarter."[1]

Lloyd's capacity, in the early months of a global pandemic, to publicly estimate claim payments of $4.3 billion is a testament to the pervasive factual commonalities of COVID-19 business interruption claims and the legal actions stemming from them. Without such commonalities, Lloyd's would be unable to estimate the value of claims made across varying jurisdictions.

## II.     Lloyd's Use of Standard ISO Policy Forms Create Factual Commonalities

Factual commonalities emanate from Lloyd's use of standard policy forms generated by Insurance Services Offices, Inc. (hereinafter "ISO").

ISO is a self-described "industry leader in standardized insurance policy forms."[2] In marketing itself to insurers, ISO boasts:

> "One word could cost you *millions*: When it comes to insurance forms, every word counts. ISO is a recognized leader in developing standardized insurance policy programs that are responsive to regulatory changes, new legislation, and appellate-level court rulings."[3]

---

[1] See https://www.lloyds.com/news-and-risk-insight/press-releases/2020/05/covid19-will-see-historic-losses-across-the-global-insurance-industry

[2] See  https://www.verisk.com/insurance/products/iso-forms/

[3] *Id.*

Lloyd's has used standardized ISO policy forms in the United States since 2000. On March 14, 2000, Julian James, managing director of Lloyd's North America, was quoted as follows in a press release announcing Lloyd's first licensing agreement with ISO:

> "This agreement will benefit everyone. Lloyd's underwriters and brokers will have ready access to full range of ISO policy wordings. Where these wordings are used, the writing of policies will be easier and more efficient, and policyholders and producers will have the comfort of knowing their Lloyd's policy is in a format that is tried, tested, and widely understood by everyone – from the local broker, to the claims adjuster and the courts."[4]

In further explaining its new relationship, Lloyd's and ISO explained as follows:

> "Lloyd's underwriters will use ISO's products and services in offering primary insurance and reinsurance in the United States. A third of Lloyd's business emanates from the United States, with a premium income of over $4 billion annually, primarily in the commercial lines field…In the United States, Lloyd's provides coverage for 80 percent of companies listed on the Dow Jones Industrial Average, and for 37 percent of the NASDAQ 100."[5]

As a result of Lloyd's use of standardized ISO policy forms, each of the scheduled actions have at their core virtually identical policy language. These standardized policies create uniform factual disputes in COVID-19 business interruption insurance actions between Lloyd's and its insureds.

### III.     Factual Commonalities Created By Lloyd's Standard ISO Policy Forms

Standardized policy forms and the nearly identical allegations of the scheduled actions require courts throughout the country to work through common factual issues that include:

1) The science of COVID-19, including whether it can be accurately classified as mold, mildew, mycotoxin, fungi, bacteria, biogenic aerosol, organic pathogen, and/or some other exclusionary term used in a Lloyd's ISO policy form.

2) The method and manner in which COVID-19 is spread and the period of time in which it can survive aerosol, on surfaces, etc. in various conditions at a property.

3) The method and manner in which COVID-19 infected properties should be tested,

---

[4] See https://www.verisk.com/archived/2000/lloyd-s-of-london-signs-its-first-license-agreement-for-services-from-insurance-services-office/

[5] *Id.*

cleaned, and sanitized and the necessary duration that such properties should be vacated to prevent further spread of the disease.

4) Whether COVID-19 causes "physical damage or loss to property" as those terms are used in Lloyd's standardized ISO policy forms.

5) Whether multiple shut downs of a business caused by COVID-19 during a given policy period constitute one occurrence or multiple occurrences for purposes of calculating the applicable limits of the policy.

6) Whether Lloyd's understood at the time it was selling insurance whether viruses such as COVID-19 could cause physical damage or loss to property.

7) What ISO, as the drafter of Lloyd's policy forms, knew and/or intended in drafting the relevant standardized forms as it relates to coverage for pandemics, viruses, etc.

8) Lloyd's and/or ISO's internal interpretation of the standardized policy forms within the context of COVID-19 contained in internal documents, including claims handling manuals and guidelines, position papers, pre-litigation coverage opinions, correspondence with re-insurers, correspondence with third party adjusting firms, correspondence with syndicates, and/or correspondence with brokers/agents.

9) Whether stay-at home, safer-at-home, self-quarantine, and/or closure orders issued by civil authorities based on the presence of COVID-19 in surrounding property is sufficient to trigger coverage in Lloyd's standardized ISO policy forms.

10) Whether stay-at home, safer-at-home, self-quarantine, and/or closure orders issued by civil authorities based on the presence of COVID-19 "prohibits access" to insured property sufficient to trigger civil authority coverage in Lloyd's standardized ISO policy forms.

11) When the period of restoration begins and ends in connection with stay-at home, safer-at-home, self-quarantine, and/or closure orders issued by civil authorities based on the presence of COVID-19 in surrounding property based on Lloyd's standardized ISO policy forms.

12) Whether the expenses incurred from closing a business or reducing services in response to stay-at home, safer-at-home, self-quarantine, and/or closure orders issued by civil authorities based on the presence of COVID-19 constitute "extra expenses" in Lloyd's standardized ISO policy forms.

13) Whether the expenses incurred from closing a business or reducing services in response to stay-at home, safer-at-home, self-quarantine, and/or closure orders issued by civil authorities based on the presence of COVID-19 constitute "preservation of property expenses" in Lloyd's standardized ISO policy forms.

### IV. Centralization Would Make The Pre-Trial Process More Efficient

The common factual issues of scheduled and subsequently filed actions will lead to common discovery.

All parties will likely rely upon scientific experts to explore the nature of COVID-19 and whether it falls within the definitions of exclusionary policy provisions and the degree to which it may cause property damage or loss.

Document requests to Lloyd's concerning common factual issues may include claims handling manuals and guidelines, pre-litigation coverage opinions, correspondence with re-insurers, correspondence with third party adjusting firms, correspondence with syndicates, and/or correspondence with brokers/agents. Depositions of corporate representatives and other witnesses are likely to span the globe given Lloyd's international operation.

Not only will such discovery be directed toward Lloyd's but also towards third parties within the larger insurance industry that may have discoverable information. Such third parties may include ISO, reinsurers of Lloyd's policies, third-party claims administrators, third party adjusting firms, brokers, and/or agents.

Pretrial procedures will likely involve motions to dismiss, discovery motions, *Daubert* motions, and class certification motions. Conflicting rulings on such motions will cause unnecessary confusion and duplicative effort.

Centralization would make the pre-trial process more efficient. It would conserve the federal judiciary's resources as it would assign responsibility for overseeing a pretrial plan to one judge as opposed to many. It would provide litigants across different jurisdictions with consistent results.

**V.     The Eastern District of Louisiana Is The Most Appropriate Transferee Forum**

Judge Sarah S. Vance and the Eastern District of Louisiana are uniquely qualified to tackle the procedural and organizational challenges of an MDL centered around first party business interruption insurance claims.

Judge Vance and the Eastern District of Louisiana are exceptionally qualified and experienced with MDL litigation.  Judge Vance is a former Chair of this Panel and has overseen past MDLs.  *See In re Educational Testing Service PLT 7-12 Test Scoring*, 350 F. Supp. 2d 1363 (J.P.M.L. 2004) and *In re Pool Products Distribution Market Antitrust Litigation,* 856 F. Supp. 2d 1341 (J.P.M.L. 2012).  This Panel has repeatedly recognized that the Eastern District of Louisiana has sufficient resources to handle complex cases and is geographically convenient. *See, e.g. In re Propulsid Prod. Liab. Litig.*, 2000 WL 35621417 (J.P.M.L. 2000); *In re Am. Nat'l Ins. Co. Indus. Life Ins. Litig.*, 2001 WL 34835734 (J.P.M.L. 2001); *In re Train Derailment Near Amite, La., on Oct. 12, 2002*, 269 F. Supp. 2d 1378 (JPML 2003); *In re High Sulfur Content Gasoline Prod. Liab. Litig.*, 344 F. Supp. 2d 755 (J.P.M.L. 2004); *In re Vioxx Prod. Liab. Litig.*, 360 F. Supp. 2d 1352 (J.P.M.L. 2005); *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 528 F. Supp. 2d 1350 (J.P.M.L. 2007); *In re Directech Sw., Inc., Fair Labor Standards Act (FLSA) Litig.*, 581 F. Supp. 2d 1370 (2008); *In re Apple IPhone 3G and 3GS "MMS" Mktg. and Sales Practices Lit.*, 657 F. Supp. 2d 1378 (J.P.M.L. 2009); *In re Franck's Lab, Inc., Prod. Liab. Litig.*, 959 F. Supp. 2d 1367 (J.P.M.L 2013); *In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*, 65 F. Supp. 3d 1402 (J.P.M.L. 2014); *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 220 F. Supp. 3d 1360 (J.P.M.L. 2016).

The Eastern District of Louisiana has extensive experience overseeing first party property

insurance litigation. In the aftermath of Hurricane Katrina, 15,554 civil suits, including dozens of putative class actions, representing an estimated 300,000 individual plaintiffs, were filed in the Eastern District of Louisiana. Judge Joseph C. Wilkinson, Jr., *The Long Road Home: Mass Settlement of Katrina Homeowners Insurance Claims in Federal Court*, 62 LYLR 373, 380 (2016). Of the individually filed cases, 1,447 cases, including many class actions, were consolidated before one judge into a single matter entitled *In Re Katrina Canal Breaches Consolidated Litigation* for case management, discovery, dispositive motion practice, bellwether trials, and settlement proceedings, using techniques suggested by the Federal Judicial Center's *Manual for Complex Litigation*. *Id.* at 382. The remaining 14,000 cases were handled by the other judges of the court. Many of the cases filed centered around business interruption insurance claims made by local businesses wiped out by Hurricane Katrina. Judge Vance likely presided over hundreds of these cases, including one of the first Katrina insurance cases to proceed to trial. *See Weiss v. Allstate Ins. Co.*, 2007 WL 2377119 (E.D.L.A. 8/16/07).

In addition to its significant experience with first party insurance actions, the Eastern District of Louisiana has also overseen an MDL involving thousands of business interruption claims associated with the BP Oil Spill. *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352 (J.P.M.L. 2010). Additionally, the Court has overseen an MDL centered around the extent to which toxic Chinese drywall caused property damage to homes and businesses and whether such damage triggered insurance coverage for claimants. *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 626 F. Supp. 2d 1346 (J.P.M.L. 2009).

## **CONCLUSION**

For the foregoing reasons, Plaintiff, Station 6, L.L.C., supports consolidation and

transfer of all scheduled and subsequent actions against Certain Underwrites at Lloyd's, London (hereinafter "Lloyd's") to the Honorable Sarah S. Vance, United States District Court for the Eastern District of Louisiana.

                Respectfully submitted,

                *s/ Stephen J. Herman*
                **STEPHEN J. HERMAN (La. Bar No. 23129)**
                **BRIAN D. KATZ (La. Bar No. 24137)**
                **SOREN E. GISLESON (La. Bar No. 26302)**
                **JOSEPH E. "JED" CAIN (La. Bar No. 29785)**
                **JOHN S. CREEVY (La. Bar No. 30879)**
                Herman, Herman & Katz, LLC
                820 O'Keefe Avenue
                New Orleans, Louisiana 70113
                Telephone: (504) 581-4892
                Facsimile: (504) 561-6024
                sherman@hhklawfirm.com
                bkatz@hhklawfirm.com
                sgisleson@hhklawfirm.com
                jcain@hhklawfirm.com
                jcreevy@hhklawfirm.com

                -AND-

                **ROBERT J. DILBERTO (La. Bar No. 24783)**
                Dilberto Law Firm
                3636 S. I-10 Service Rd., Suite 210
                Metairie, LA 70002
                Telephone: (504) 828-1600
                Robert@GetRJD.com