**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE: CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, COVID-19 BUSINESS INTERRUPTION PROTECTION INSURANCE LITIGATION** | **MDL No. 2961** |

---

INTERESTED PARTIES
AMERICAN PROPERTY AND CASUALTY INSURANCE ASSOCIATION
AND NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES
RESPONSE TO ORDER TO SHOW CAUSE

---

James R. Martin
Jennifer D. Hackett
Zelle LLP
1775 Pennsylvania Avenue, NW
Suite 375
Washington, DC  20006
202-899-4100

Steven J. Badger
Zelle LLP
901 Main Street
Suite 4000
Dallas, TX 75202
214-749-4207

*Attorneys for Interested Parties American Property Casualty Insurance Association
and National Association of Mutual Insurance Companies*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

STATEMENT OF INTEREST ..................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 2

FORMATION OF INSURER-SPECIFIC COVID-19 BUSINESS INTERRUPTION
LAWSUITS WOULD NOT BE JUST AND EFFICIENT ......................................... 5

    A.    Questions of State Law Will Predominate in All COVID-19 Business Interruption
    Cases ................................................................................................................. 5

    B.    Plaintiff-Specific Issues Will Dominate Discovery ................................ 9

    C.    Creation of One or More Insurer-Specific MDLs Would Promote Forum
    Shopping and Incentivize Additional Lawsuits .................................... 13

    D.    Movants Provide No Principled Criteria to Identify Which Actions They Would
    Seek to Include in a Lloyd's-Specific MDL ........................................ 13

CONCLUSION ............................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**                                                                                                         **Page(s)**

*Billy Goat Tavern I v. Society Ins.*,
   1:20-cv-02068 (N.D. Ill.) ...................................................................................................8

*Coffey & McKenzie, LLC v. Twin City Fire Ins. Co. d/b/a The Hartford*,
   No. 20-cv-1671-BHH (D.S.C.) ...........................................................................................8

*Diesel Barbershop, LLC v. State Farm Lloyds*,
   No. 5:20-CV-461-DAE, 2020 WL 4724305 (W.D. Tex. Aug. 13, 2020) ..............................5

*Egg and I, LLC et al. v. U.S. Specialty Insurance Company, Tokio Marine*,
   Case No. 2:20-cv-00747 (D.N.V.) .....................................................................................15

*Egg Works Holding Company, LLC et al v. Acuity*,
   Case No. 2:20-cv-00748 (D.N.V.) .....................................................................................15

*Ferens v. John Deere Co.*,
   494 U.S. 516 (1990) .............................................................................................................7

*Florida Wellness Center of Tallahassee v. Hartford Cas. Ins. Co.*,
   No. 4:20-cv-00279, Dkt. No. 27, Order of Dismissal (N.D. Fla. Aug. 13,
   2020)......................................................................................................................................6

*Gavrilides Management Co. LLC v. Michigan Ins. Co.*,
   No. 20-258-CB, 2020 WL 4561979 (Mich. Cir. Ct. July 21, 2020) .....................................6

*In re Aegon USA, Inc., Supplemental Cancer Ins. Litig.*,
   571 F. Supp. 2d 1369 (J.P.M.L. 2008) ...............................................................................11

*In re Best Buy, Inc., California Song-Beverly Credit Card Act Litig.*,
   804 F. Supp. 2d 1376 (J.P.M.L. 2011) .................................................................................4

*In re: Children's Pers. Care Prod. Liab. Litig.*,
   655 F. Supp. 2d 1365 (J.P.M.L. 2009) .................................................................................7

*In Re: Chinese-Manufactured Drywall Products Liability Litigation*,
   MDL No. 2047, Order Denying Transfer (Doc. 257) (J.P.M.L. June 15, 2010) ..................11

*In re ClearTalk-ZTE Arbitration Litig.*,
   24 F. Supp. 3d 1374 (J.P.M.L. 2014) ...................................................................................6

*In re: COVID-19 Bus. Interruption Prot. Ins. Litig.*,
   MDL No. 2942, 2020 WL 4670700 (J.P.M.L. Aug. 12, 2020) .............................................3

*In re: Electrolux Dryer Prod. Liab. Litig.*,
   978 F. Supp. 2d 1376 (J.P.M.L. 2013) ...............................................................................12

*In re Fla., Puerto Rico, & U.S. Virgin Islands 2016 & 2017 Hurricane Seasons Flood Claims Litig.*,
325 F. Supp. 3d 1367 (J.P.M.L. 2018) ................................................................8

*In re: Healthextras Ins. Mktg. & Sales Practices Litig.*,
24 F. Supp. 3d 1376 (J.P.M.L. 2014) ..................................................................6

*In re Ins. Companies "Silent" Preferred Provider Org. (PPO) Litig.*,
517 F. Supp. 2d 1362 (J.P.M.L. 2007) ..............................................................11

*In re: Mortg. Lender Force-Placed Ins. Litig.*,
895 F. Supp. 2d 1352 (J.P.M.L. 2012) ..............................................................12

*In re Rolls Royce Corp.*,
775 F.3d 671 (5th Cir. 2014) ..............................................................................7

*In re: Table Saw Prod. Liab. Litig.*,
641 F. Supp. 2d 1384 (J.P.M.L. 2009) ..............................................................12

*In re Takata Airbag Prod. Liab. Litig.*,
No. 14-24009-CV, 2020 WL 1057471 (S.D. Fla. Mar. 3, 2020)..........................9

*In re: The Great W. Cas. Co. Ins. Litig.*,
176 F. Supp. 3d 1371 (J.P.M.L. 2016) ......................................................... 11, 12

*In re Title Ins. Real Estate Settlement Procedures Act (RESPA) & Antitrust Litig.*,
560 F. Supp. 2d 1374 (J.P.M.L. 2008) ..............................................................11

*In re: Tyson Foods, Inc., Meat Processing Facilities Fair Labor Standards Act (FLSA) Litig.*,
581 F. Supp. 2d 1374 (J.P.M.L. 2008) ..............................................................11

*In re: United Healthcare Services, Inc. Harvoni (Ledipasvir and Sofosbuvir) Health Ins. Litig.*,
222 F. Supp. 3d 1339 (J.P.M.L. 2016) ................................................................4

*Larsen v. Citibank FSB*,
871 F.3d 1295 (11th Cir. 2017)............................................................................6

*Mama Jo's, Inc. v. Sparta Ins. Co.*,
No. 17-cv-23362-KMM, 2018 WL 3412974 (S.D. Fla. June 11, 2018)................9

*NCR Credit Corp. v. Ye Seekers Horizon, Inc.*,
17 F. Supp. 2d 317 (D.N.J. 1998) .......................................................................8

*Reliable Marine Towing & Salvage LLC v. Thomas*,
789 F. App'x 805, 807 (11th Cir. 2019 ...........................................................2, 5

*Rose's 1, LLC v. Erie Ins. Exchange*,
  No. 2020 CA 002424 B, 2020 WL 4589206 (D.C. Super. Ct. Aug. 06, 2020).......................5

*Sallyport Glob. Servs., Ltd. v. Arkel Int'l, LLC*,
  78 F. Supp. 3d 369 (D.D.C. 2015) ...................................................................................7

*Social Life Magazine, Inc. v. Sentinel Ins. Co*,
  No. 20-Civ-3311 (VEC), 2020 WL 2904834 (S.D.N.Y. May 14, 2020) ...............................6

*The Inns By The Sea v. California Mutual Ins. Co.*,
  No. 20CV001274 (Cal. Super. Ct. Aug. 6, 2020) ...............................................................6

*Wells Fargo Bank, N.A. v. Allstate Ins. Co.*,
  784 F. App'x 401, 403 (6th Cir. 2019 ..............................................................................5

*Windber Hospital v. Travelers Property Casualty Co. of Am.*,
  No. 3:20-CV-00080 (W.D. Pa.) ........................................................................................8

**Rules**

6.2(e) R.P.J.P.M.L.......................................................................................................................2

**Statutes**

15 U.S.C.A. § 1011 *et seq.* .........................................................................................................9

28 U.S.C. § 1407 ........................................................................................................................6

**Other Authorities**

2 Couch on Insurance § 22.9 (3d ed. update 2019) ...............................................................10

11A Couch on Insurance § 167:15 (3d ed. update 2019).........................................................5

11A Couch on Insurance § 2:4 (3d ed. update 2019)...............................................................9

15 Charles W. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice
  and Procedure* § 3866 (3d ed. 2007)...............................................................................7

## STATEMENT OF INTEREST

AMERICAN PROPERTY CASUALTY INSURANCE ASSOCIATION ("APCIA") is a not-for-profit corporation domiciled in the District of Columbia with an executive office in the District of Columbia, a principal place of business in Chicago, Illinois, and offices in other states.  APCIA is the primary national trade association for home, auto, and business insurers.  APCIA promotes and protects the viability of private competition for the benefit of consumers and insurers, with a legacy dating back 150 years.  APCIA members represent all sizes, structures, and regions—protecting families, communities, and businesses in the U.S. and across the globe.

APCIA's member companies write $412 billion in direct written premium and assumed reinsurance premium, representing nearly 60 percent of the U.S. property-casualty insurance market, including 67 percent of the commercial property insurance market.  On issues of importance to the insurance industry and marketplace, APCIA advocates sound public policies on behalf of its members in legislative and regulatory forums at the federal and state levels and regularly submits *amicus curiae* briefs in significant cases before federal and state courts.

NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES ("NAMIC") is a national trade association consisting of more than 1,400 member companies.  NAMIC estimates that 265 of its members wrote property insurance coverage in 2019.  NAMIC supports regional and local mutual insurance companies on main streets across America and many of the country's largest national insurers.  NAMIC member companies write $268 billion in annual premiums.  NAMIC members account for 59 percent of homeowners, 46 percent of automobile, and 29 percent of the business insurance markets.

Through its advocacy programs, NAMIC promotes public policy solutions that benefit NAMIC member companies and the policyholders they serve to foster greater understanding and

recognition of the unique alignment of interests between management and policyholders of mutual companies.

Pursuant to Rule 6.2(e) of the Rules of Procedure for the Judicial Panel on Multidistrict Litigation, APCIA and NAMIC (collectively, "*Amici*") submit this brief as Interested Parties to offer industry perspectives that *Amici* believe will assist the Panel in its consideration of the Orders to Show Cause.  *Amici* believe their unique national viewpoint will be useful in highlighting fundamental issues that weigh against granting the transfer and consolidation.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

As the Panel recognized in its Order denying requests to form industry-wide, regional, and state-based MDLs, the proposals for "insurer-specific" MDLs were submitted late in the briefing process and were "often vague as to which actions would be included in a given MDL." Dkt. No. 772 at 3-4.  In general, the proposals all rest on the same mistaken view that every action against a particular insurer must necessarily involve similar policy terms and, therefore, centralization of those lawsuits would be convenient for parties and witnesses, and promote the just and efficient conduct of those actions.  That is not true.  Centralization of all such actions against Certain Underwriters at Lloyd's, London– or any similarly situated insurer -- would undermine the goals of fairness and judicial efficiency for at least the following reasons.

First, the core questions to be answered in business interruption cases are legal ones to be resolved under various state laws.  *See, e.g., Reliable Marine Towing & Salvage LLC v. Thomas*, 789 F. App'x 805, 807 (11th Cir. 2019) ("Interpretation of the terms of an insurance policy is a matter of law").  It would be fairer and more efficient to allow the home forum courts to address

---

[1] No party or its counsel (1) authored this brief in whole or in part, or (2) contributed money that was intended to fund preparing or submitting this brief.  No other person contributed money that was intended to fund preparing or submitting this brief other than *Amici* and their counsel.

those questions of law because those courts are more familiar with the laws of the states in which they sit. Allowing those courts to rule on questions of state law will promote a clear, consistent, and reasoned development of law in those jurisdictions.

Second, to the extent fact questions exist, discovery related to those fact questions will focus on each plaintiff and its individual circumstances. For example, was the coronavirus actually on the insured's property? If so, for how long? By contrast, there will be very little discovery required of the insurer because contracts are typically enforced according to their plain meaning. Thus, centralizing the Certain Underwriters at Lloyd's, London actions would result in the same "substantial convenience and efficiency challenges" that outweighed the "very few common questions of fact" that the Panel found determinative in declining to create industry-wide or state-specific MDLs. *In re: COVID-19 Bus. Interruption Prot. Ins. Litig.*, MDL No. 2942, 2020 WL 4670700, at *3 (J.P.M.L. Aug. 12, 2020).

Third, *Amici*[2] believe that granting the requests for transfer orders would incentivize plaintiffs to file more actions against insurers not subject to the five pending OSCs for the purpose of seeking to trigger the creation of additional insurer-specific MDLs. Such actions would obviously impose unnecessary burdens on the judicial system and offset any perceived efficiency gains of centralization.

Fourth, it is not uncommon for more than one insurer to provide coverage for a commercial property. For example, major commercial property risks are often insured by a "market" of multiple insurers in an "insurance tower." Each layer in the tower typically has

---

[2] *Amici's* members include more than 800 companies that wrote property insurance policies, which could be the subject of business interruption actions. Certain insurers named as Defendants in the actions subject to the Orders to Show Cause are members of APCIA and/or NAMIC and pay dues to support the general operations of those organizations only, and had no role in preparing, submitting, or funding this brief.

multiple participating insurers responsible for varying percentages of the risk.  While the insurance policy language is sometimes common to all insurers in the tower, often each participating insurer either uses its own wording or issues unique endorsements and exclusions that amend the common wording.  Accordingly, there is no efficiency justification for centralizing "market" cases merely because Certain Underwriters at Lloyd's, London is named as one of the defendant insurers in such situations.  And it would be unfair and inconvenient to all the defendant "market" insurers who would either be forced into a Lloyd's MDL or be required to litigate their claims separate from the case against Certain Underwriters at Lloyd's, London involving the same insured.  There are also situations in which the property owner purchasing complementary policies for different risks – such as a restaurant owner may purchase a policy to protect against physical damage and a separate policy to protect against food contamination – and may bring suit under both policies for the alleged unlawful denial of coverage.  In all instances involving multiple insurers of a single property, it would be more efficient for the lawsuits to be litigated before the same local judge rather than carve out one or more of those actions for transfer to an MDL.

On balance, *Amici* submit that the more efficient course of action is to let the cases go forward in their home forums.  *See In re Best Buy, Inc., California Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1378 (J.P.M.L. 2011) (centralization under Section 1407 should be the "last solution after considered review of all other options").  To the extent there is any "common" discovery of an insurer, the courts can informally coordinate to eliminate duplicative discovery.  *See, e.g., In re: United Healthcare Services, Inc. Harvoni (Ledipasvir and Sofosbuvir) Health Ins. Litig.*, 222 F. Supp. 3d 1339, 1341 (J.P.M.L. 2016) ("Various mechanisms are available to minimize or eliminate the possibility of duplicative discovery even

without an MDL.  Notices of deposition can be filed in all related actions; the parties can

stipulate that any discovery relevant to more than one action can be used in all those actions; or

the involved courts may direct the parties to coordinate their pretrial activities.")

     *Amici* respectfully submit that the request for a Lloyd's-specific MDL be denied.

### FORMATION OF INSURER-SPECIFIC COVID-19 BUSINESS INTERRUPTION LAWSUITS WOULD NOT BE JUST AND EFFICIENT

    **A.**    **Questions of State Law Will Predominate in All COVID-19 Business Interruption Cases**

     Business interruption coverage generally requires physical damage to the insured's

property.  11A Couch on Insurance § 167:15 (3d ed. update 2019).  The first questions to be

answered in any COVID-19 business interruption case will be questions of law, namely how to

interpret the policy under governing state law and whether, as interpreted, the policy could

plausibly provide coverage based on the allegations of each plaintiff.  *See, e.g., Reliable Marine*,

789 F. App'x at 807 ("Interpretation of the terms of an insurance policy is a matter of law");

*Wells Fargo Bank, N.A. v. Allstate Ins. Co.*, 784 F. App'x 401, 403 (6th Cir. 2019) ("'An

insurance policy is a contract whose interpretation is a matter of law' for judges, not juries, to

decide.").  In fact, several courts have already disposed of COVID-19 business interruption

claims because the undisputed facts as a matter of law preclude coverage.  *See, e.g., Diesel

Barbershop, LLC v. State Farm Lloyds*, No. 5:20-CV-461-DAE, 2020 WL 4724305, at *7 (W.D.

Tex. Aug. 13, 2020) (granting defendant insurer's motion to dismiss upon finding "[w]hile there

is no doubt that the COVID-19 crisis severely affected Plaintiffs' businesses, State Farm cannot

be held liable to pay business interruption insurance on these claims as there was no direct

physical loss, and even if there were direct physical loss, the Virus Exclusion applies to bar

Plaintiffs' claim."); *Rose's 1, LLC v. Erie Ins. Exchange*, No. 2020 CA 002424 B, 2020 WL

4589206 (D.C. Super. Ct. Aug. 06, 2020) (granting summary judgment in favor of defendant

insurer and ruling that the closure of the insured's business due to coronavirus-related government orders did not constitute a "direct physical loss" under the insurance policy); *The Inns By The Sea v. California Mutual Ins. Co.*, No. 20CV001274 (Cal. Super. Ct. Aug. 6, 2020) (granting defendant insurer's demurrer on the grounds that the plaintiff failed to state facts sufficient to constitute a cause of action); *Gavrilides Management Co. LLC v. Michigan Ins. Co.*, No. 20-258-CB, 2020 WL 4561979 (Mich. Cir. Ct. July 21, 2020) (granting defendant insurer's motion for summary disposition); *Social Life Magazine, Inc. v. Sentinel Ins. Co*, No. 20-Civ-3311 (VEC), 2020 WL 2904834 (S.D.N.Y. May 14, 2020) (case voluntarily dismissed following the Court's denial of plaintiff's motion for a preliminary injunction); *Florida Wellness Center of Tallahassee v. Hartford Cas. Ins. Co.*, No. 4:20-cv-00279, Dkt. No. 27, Order of Dismissal (N.D. Fla. Aug. 13, 2020) (issued in response to the plaintiff's notice of voluntary dismissal).

Common questions of law are not a proper basis for centralization. *See, e.g.*, *In re: Healthextras Ins. Mktg. & Sales Practices Litig.*, 24 F. Supp. 3d 1376, 1377 (J.P.M.L. 2014) (denying centralization because "the key issue in all cases is legal in nature," i.e., whether the subject policies were issued in compliance with the law of the state in which that particular case was brought. "Whether the subject policies in the District of New Jersey action were issued in conformance with New Jersey law, for example, has no bearing on whether the subject policies in the Northern District of Texas action were issued in conformance with Texas law."); *In re ClearTalk-ZTE Arbitration Litig.*, 24 F. Supp. 3d 1374, 1375 (J.P.M.L. 2014) ("[T]he resolution of purely a legal issue or issues is generally insufficient to warrant centralization.").

That is particularly true where the questions of law arise under the law of the state or territory that governs the particular policy. *See, e.g., Larsen v. Citibank FSB*, 871 F.3d 1295, 1303 (11th Cir. 2017) ("In a multi-district case transferred under 28 U.S.C. § 1407, the transferee

court applies the choice-of-law rules of the state in which the action was filed.") (citing

*Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993)); *In re Rolls Royce Corp.*, 775 F.3d 671, 683

n.57 (5th Cir. 2014) ("'When a transferee court presides over several diversity actions

consolidated under the multidistrict rules, the choice of law rules of each jurisdiction in which

the transferred actions were originally filed must be applied.'") (quoting *In re Air Disaster at*

*Ramstein Air Base, Germany, on 8/29/90*, 81 F.3d 570, 576 (5th Cir. 1996)); 15 Charles W.

Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3866 (3d ed.

2007).  In the context of COVID-19 business interruption litigation, there are no efficiencies to

be gained by asking a single judge to determine on a case-by-case basis the relevant choice of

law and to then apply the chosen state law on such a large scale.  *See, e.g.*, *In re: Children's*

*Pers. Care Prod. Liab. Litig.*, 655 F. Supp. 2d 1365, 1366 (J.P.M.L. 2009) ("Any common

issues, however, are overshadowed by the non-common ones.").

Resolution of these legal issues in all cases involving even a single insurer would not

only impose an unnecessary burden if centralized before a single district court, they would also

undermine the efficient development of state-specific case law because the original districts are

far better acquainted with the laws of the states in which they sit.  The more just and efficient

course would be to allow the district courts in the home forums to decide those cases in order to

promote a clear, consistent, and reasoned development of law in those jurisdictions.  *See, e.g.*,

*Ferens v. John Deere Co.*, 494 U.S. 516, 530 (1990) ("'There is a local interest in having

localized controversies decided at home.  There is an appropriateness too, in having the trial of a

diversity case in a forum that is at home with the state law that must govern the case, rather than

having a court in some other forum untangle problems in conflicts of laws, and in law foreign to

itself.'") (quoting *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–509 (1947)); *see also Sallyport*

*Glob. Servs., Ltd. v. Arkel Int'l, LLC*, 78 F. Supp. 3d 369, 375 (D.D.C. 2015) (collecting cases standing for the proposition that "district courts often transfer cases to the forum with the most familiarity with the state laws applicable to the parties' dispute."); *NCR Credit Corp. v. Ye Seekers Horizon, Inc.*, 17 F. Supp. 2d 317, 323 (D.N.J. 1998) ("'[J]ustice requires that, whenever possible, a diversity case should be decided by the court most familiar with the applicable state law.'") (alteration in original) (quoting *Heller Financial, Inc. v. Shop–A–Lot, Inc.*, 680 F. Supp. 292, 296 (N.D. Ill. 1988)).

Moreover, the fact that the underlying actions are being resolved expeditiously further counsels against the creation of an MDL in this proceeding. *See, e.g.*, *In re Fla., Puerto Rico, & U.S. Virgin Islands 2016 & 2017 Hurricane Seasons Flood Claims Litig.*, 325 F. Supp. 3d 1367, 1369 n.4 (J.P.M.L. 2018) (noting how dismissals of actions sought to be consolidated supported the "contention that very few of these cases are litigated through trial or require substantial judicial involvement") (citing *In re: Brandywine Commc'ns Tech., LLC Patent Litig.*, 959 F. Supp. 2d 1377, 1378 (J.P.M.L. 2013) (denying centralization because, *inter alia*, the subject actions were "being litigated in a manner that is likely to lead to their resolution, whether through settlement or other means, within a relatively short period of time"). Numerous other motions are also pending and ripe for decision. *Amici* are informed that there are more than 20 fully briefed motions to dismiss against various insurers around the country. For those cases, it would be more efficient to let the home forum court rule on those motions. *See, e.g.*, *Coffey & McKenzie, LLC v. Twin City Fire Ins. Co. d/b/a The Hartford*, No. 20-cv-1671-BHH (D.S.C.); *Billy Goat Tavern I v. Society Ins.*, 1:20-cv-02068 (N.D. Ill.); *Windber Hospital v. Travelers Property Casualty Co. of Am.*, No. 3:20-CV-00080 (W.D. Pa.).

Importantly, both the structure and history of insurance regulation confirm that insurance disputes have a uniquely local character that makes them poor candidates for centralization under federal law. From the beginning, the business of insurance in this country has been subject to virtually no federal regulation, and Congress definitively ceded this regulatory field to the states in the McCarran-Ferguson Act, 15 U.S.C.A. § 1011 *et seq. See also generally,* 11A Couch on Insurance § 2:4 (3d ed. update 2019) ("The purpose of the McCarran-Ferguson Act was 'to restore the supremacy of the states in the realm of insurance regulation.'") (quoting *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 39 (1996)). Underlying this regulatory regime is a recognition that questions of insurance law frequently implicate issues that are peculiar to a particular jurisdiction or locality—questions that can best be decided under our federal system in the states where they arise. *See, e.g.*, *In re Takata Airbag Prod. Liab. Litig*., No. 14-24009-CV, 2020 WL 1057471, at *4 (S.D. Fla. Mar. 3, 2020) (remanding certain actions because "nearly all the claims in each group action complaint are state specific" and "transferor courts are 'familiar with the state law of their respective jurisdictions' and thus 'are in a better position to assess' state claims.") (quoting *In re Activated Carbon-Based Hunting Clothing Mktg. & Sales Practices Litig*., 840 F. Supp. 2d 1193, 1199, 1201 (D. Minn. 2012)). When the cases currently before the Panel are viewed against this backdrop of federalism and longstanding state autonomy in insurance matters, it becomes clear that they should not be decided by a single federal judge sitting thousands of miles from where many of the disputes arose.

### B.    Plaintiff-Specific Issues Will Dominate Discovery

Even if a particular plaintiff's claim can survive a motion for summary disposition, the fact questions in dispute will focus squarely on the particular circumstances of each individual plaintiff. Such questions will include whether the coronavirus was on the insured's property;

how long it remained on the property; whether the insured's property could be cleaned;[3] whether the cause of loss was "direct physical property damage" or, rather, by the unwillingness of people to gather in groups or the impact of government orders issued to promote social distancing; whether the property was truly inaccessible, the amount of damage that the plaintiff can reasonably claim it suffered, etc.

The plaintiffs include a wide range of businesses -- restaurants, salons, casinos, gyms, motels, medical facilities, movie theaters, retail stores, and minor league baseball teams.  For each category of business, the key coverage questions will differ.  Some businesses were deemed "essential."  Some were not.  Some could remain open.  Some could not.  Some were subject to civil authority orders.  Some were not.  Some allege the presence of coronavirus on the premises as the basis for their alleged "covered loss."  Others *deny* that the coronavirus was on premises in an attempt to plead around virus exclusions that expressly deny coverage for losses caused directly or indirectly by the virus.  In those cases, the plaintiffs seek coverage under "civil authority" clauses which can be triggered only when physical damage to another's property within a certain distance of the insured premises prohibited access to the covered property.

---

[3] *See, e.g., Mama Jo's, Inc. v. Sparta Ins. Co.*, No. 17-cv-23362-KMM, 2018 WL 3412974, at *8-9 (S.D. Fla. June 11, 2018) (affirmed on appeal by *Mama Jo's Inc. v. Sparta Insurance Company*, --- F. App'x --- (2020).  Even if an insured is able to meet its burden of proving it is entitled to business interruption coverage, such coverage is typically limited to a "period of restoration" as that phrase is defined in the policy.  While definitions vary across policies, some policies provide that the "period of restoration" begins 24 hours after the direct physical loss or damage from a covered cause of loss and ends when the property should be repaired with reasonable speed and similar quality.  Here, even if it is determined that COVID-19 is a covered cause of loss that caused physical loss or damage to covered property which, in turn, caused a necessary suspension of the insured's business operations, there is no coverage for lost business income if the property can be cleaned before the period of restoration begins.

10

None of these individual, plaintiff-specific fact questions lend themselves to common discovery. By contrast, discovery of the insurer will be minimal. Unambiguous insurance policies are typically enforced without resort to extrinsic evidence.[4] 2 Couch on Insurance § 22.9 (3d ed. update 2019). The Panel has previously recognized that centralization was not required to efficiently resolve large-scale insurance coverage litigation. *In re Fla., Puerto Rico, & U.S. Virgin Islands Litig.*, 325 F. Supp. 3d at 1368–69 (denying centralization of actions alleging that plaintiffs' respective insurance companies breached the terms of their policies upon a finding that "each case necessarily involves different property, different insureds, different witnesses, different proofs of loss, and different damages" and thus, the "very nature of the cases ensures that unique issues concerning each plaintiff's loss, claim, investigation, and claim handling will predominate, and overwhelm any efficiencies that centralization might achieve").[5]

---

[4] To the extent there will be discovery of Certain Underwriters at Lloyd's, London, it will likely be document-focused. Documents produced in one action can easily be produced in other actions without forming an MDL.

[5] *See also In re: The Great W. Cas. Co. Ins. Litig.*, 176 F. Supp. 3d 1371, 1372 (J.P.M.L. 2016) ("We cannot centralize all claims in which a particular insurer denies coverage or all cases involving Medicare. These basic commonalities among the cases are far outweighed by the unique facts and legal issues presented by each case."); *In re: Chinese-Manufactured Drywall Products Liability Litigation*, MDL No. 2047, Order Denying Transfer (Doc. 257) at 2 (J.P.M.L. June 15, 2010) ("Each of the insurance coverage questions in these cases is likely to be decided by an application of the complaint to the policy language under the applicable state law" despite the "common factual backdrop involving the general circumstances of imported Chinese drywall and the damage it is alleged to have caused."); *In re Aegon USA, Inc., Supplemental Cancer Ins. Litig.*, 571 F. Supp. 2d 1369, 1370 (J.P.M.L. 2008) (denying centralization of seven actions where the key issue—the proper interpretation of insurance policies—was "legal rather than factual"); *In re Title Ins. Real Estate Settlement Procedures Act (RESPA) & Antitrust Litig.*, 560 F. Supp. 2d 1374, 1376 (J.P.M.L. 2008) (denying transfer and centralization of actions asserting claims under different state laws which "encompass[ed] different regulatory regimes in the states in which actions are pending along with variances in insurance regulation and law in each state"); *In re Ins. Companies "Silent" Preferred Provider Org. (PPO) Litig.*, 517 F. Supp. 2d 1362, 1363 (J.P.M.L. 2007) (denying consolidation of cases involving "different defendant insurance companies" and "different contracts").

In light of these factors, centralization would be less efficient than the traditional method of litigating each action individually.  *See, e.g.*, *In re: Tyson Foods, Inc., Meat Processing Facilities Fair Labor Standards Act (FLSA) Litig.*, 581 F. Supp. 2d 1374, 1375 (J.P.M.L. 2008) (denying transfer where "[d]iscovery is likely to be plant-specific and proceed on a plant-by-plant basis"); *see also In re: Electrolux Dryer Prod. Liab. Litig.*, 978 F. Supp. 2d 1376, 1377 (J.P.M.L. 2013) (denying transfer where "[a]lthough these actions share factual questions arising out of allegations that dryers manufactured by Electrolux have a common design defect that has resulted in fires . . . it appears that individualized facts concerning the circumstances of each fire, including installation, repair, and maintenance, will predominate over the common factual issues alleged by plaintiffs."); *In re: The Great W. Cas. Co. Ins. Litig.*, 176 F. Supp. 3d at 1372 ("[W]hile Mr. Johnson argues that discovery will overlap . . . he fails to specifically identify any discovery that will be common to these actions.  The discovery he identifies as common to the actions, such as 'underwriting files' and 'all writing correspondence,' is far too broad to provide a basis for centralization."); *In re: Mortg. Lender Force-Placed Ins. Litig.*, 895 F. Supp. 2d 1352, 1353 (J.P.M.L. 2012) ("[T]he mortgage contracts at issue vary widely as to key matters such as the amount of the insurance coverage required, the payment of commissions, and other rights of the borrower and lender.  Thus, individualized discovery and legal issues are likely to be numerous and substantial. . . .  In light of these significant factual differences, the Panel has also determined that centralization of the actions on a bank-specific basis is not warranted"); *In re: Table Saw Prod. Liab. Litig.*, 641 F. Supp. 2d 1384 (J.P.M.L. 2009) (denying centralization where common issues were "overshadowed by the non-common ones," including the fact that "[e]ach action arises from an individual accident that occurred under necessarily unique circumstances").

**C.**     **Creation of One or More Insurer-Specific MDLs Would Promote Forum Shopping and Incentivize Additional Lawsuits**

If the Panel forms one or more insurer-specific MDLs, there is a real risk that the Panel's orders will encourage plaintiffs to strategically file "enough" actions in multiple judicial districts to seek centralization.  Indeed, in just the few weeks following the Panel's issuance of its orders to show cause, several plaintiff groups moved for reconsideration to seek creation of additional insurer-specific MDLs.

If plaintiffs perceive some threshold number of lawsuits would justify formation of an MDL, they would have an incentive to file the requisite number of actions in different districts to meet that threshold.  This is particularly true in the arena of class actions, where competition for appointment as "interim lead counsel" of overlapping or duplicative class actions is fierce and a "home forum" is often perceived as an advantage for counsel seeking appointment.

*Amici* respectfully submit that the creation of one or more insurer-specific MDLs could result in more, not less, of a litigation burden on the federal court system.

**D.**     **Movants Provide No Principled Criteria to Identify Which Actions They Would Seek to Include in a Lloyd's-Specific MDL**

Movants seek centralization of all actions "involving" insurers "associated with" Certain Underwriters at Lloyd's, London and related entities.  *In re: COVID-19 Bus. Interruption Prot. Ins. Litig.*, MDL No. 2942, Dkt. 473 at 2; Dkt 462 at 1 (J.P.M.L).  In other words, the sole proposed criteria for transfer is that a complaint name a Lloyd's entity as a defendant.  That criteria would be facially over-inclusive because, among other reasons, it would include actions in which Certain Underwriters at Lloyd's, London was just one of several insurers of the same property.

For example, in a "market" program, the property owner's property insurance policy is divided among different insurers participating in varying percentages at different layers of

coverage (e.g. up to $10 million, $10 million to $25 million, in excess of $25 million) in an insurance "tower."  In the example below, 18 insurers provide coverage to a single insured:



The insurer with the largest percentage may be considered the "lead," but the coverage terms for each insurer in the tower are not necessarily identical, and any liability is several and not joint.  Each insurer in the market has the ability to implement idiosyncratic and occasionally conflicting coverage terms that alter the "lead form."  For example, there may be situations

where the "lead" insurer's wording provides coverage for communicable disease response under certain conditions while other insurers in that same layer issued an endorsement expressly excluding such coverage.  In other instances, the "lead" insurer's wording may not contain a virus exclusion while other insurers in the program issued an exclusion excluding loss or damage caused directly or indirectly by any virus.  Centralization of these "market" cases would not promote their just and efficient conduct or serve the convenience of the parties and witnesses just because Certain Underwriters at Lloyd's, London is one of the many defendant insurers.  To the contrary, it would force insurers other than Certain Underwriters at Lloyd's, London to litigate in another forum merely because they are part of the same market, or require those insurers to litigate their part of the market claim in a separate forum while Certain Underwriters at Lloyd's, London litigates related issues in the transferee forum.

Movants' proposed criteria would also pull in cases (current or future) in which Certain Underwriters at Lloyd's, London is one of two or more insurers that issued complementary policies for the same property.  For example, a restaurant owner may purchase a commercial property policy and a food contamination policy to cover different risks.  Depending on the language of the policy, an insured may file actions against both insurers for COVID-19-related losses.  *See, e.g.*, *Egg and I, LLC et al. v. U.S. Specialty Insurance Company, Tokio Marine*, Case No. 2:20-cv-00747 (D.N.V.) (contamination policy); *Egg Works Holding Company, LLC et al v. Acuity*, Case No. 2:20-cv-00748 (D.N.V.) (commercial property policy).  In such situations, it would make more sense to let the same judge address all claims for losses alleged by the plaintiff rather than carve one out for transfer to an MDL.

## CONCLUSION

For the forgoing reasons, *Amici* respectfully urge this Court deny the motions to transfer and consolidate the actions.

Dated:  August 26, 2020

Respectfully submitted,

By: */s/ James R. Martin*

    James R. Martin                    Steven J. Badger
    Jennifer D. Hackett             Zelle LLP
    Zelle LLP                      901 Main Street
    1775 Pennsylvania Avenue, NW    Suite 4000
    Suite 375                     Dallas, TX 75202
    Washington, DC  20006        214-749-4207
    202-899-4100

    *Attorneys for Interested Parties American Property Casualty Insurance Association*
    *and National Association of Mutual Insurance Companies*