### BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| In re: Certain Underwriters at Lloyd's, London, COVID-19 Business Interruption Protection Insurance Coverage Litigation | MDL No.   2961 |

### <u>RESPONSE TO THE ORDER TO SHOW CAUSE</u>

Certain Underwriters at Lloyd's, London trading as Syndicates HIS 33, MSP 318, HDU 382, FDY 435, KLN 510, AUW 609, AFB 623, SAM 727, CSL 1084, TAL 1183, AMA 1200, AES 1225, ASC 1414, AXS 1686, DUW 1729, ACS 1856, QBE 1886, SKD 1897, WRB 1967, APL 1969,  AML 2001, XLC 2003, NVA 2007, MMX 2010, CHN 2015, ARG 2121, CGM 2488, NEO 2468, AFB 2623, MAP 2791, BRT 2987, BRT 2988, AGR 3268, HCC 4141, XIS H4202, CNP 4444, TRV 5000, VSM 5678, WBC 5886, and PPP 9981, along with Axis Specialty Europe SE, HDI Global Specialty SE, Vanguard Claims Administration, Inc. and Blair & Company (collectively, "DSA"),[1] pursuant to Rules 6.1 and 8.1 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation and 28 U.S.C. § 1407, respectfully submit their Response to the Panel's August 12, 2020, Order to Show Cause (the "Order"). (D.E. 3).

The Order directs DSA to show cause why the actions listed on Schedule A to the Order, as well as actions identified in subsequently filed Notices of Related Actions (collectively, the "Subject Actions"), and subsequent tag-along actions, should not be transferred to a single district for consolidated or coordinated pretrial proceedings under 28 U.S.C. § 1407 (the "Lloyd's MDL").

---

[1] "DSA" is an acronym for "Defendants in Subject Actions." DSA note that Axis Specialty Europe SE and HDI Global Specialty SE are not Lloyd's underwriters. Further, Vanguard Claims Administration and Blair & Company are not insurers, but claims management companies. *What We Do / Claims*, BLAIR CLAIMS MGMT., https://www.blairandco.net/What-We-Do/Claims (last visited Aug. 26, 2020); *Services*, VANGUARD CLAIMS, https://www.vanguardclaims.com/expertise/services/ (last visited Aug. 26, 2020). This distinction is a harbinger of the lack of factual commonality that renders consolidation of these actions inappropriate.

In its August 12, 2020 order, the Panel declined to create an industry-wide MDL, citing the following factors:

- core common questions of fact posited by movants share only a superficial commonality;
- lack of common defendants results in little potential for common discovery across the litigation
- there are numerous variations to policy language even when "standardized" forms are the basis for each policy; and
- multiple parties and multiple policies present managerial and efficiency concerns, and thus, consolidation does not promote a quick resolution of the matter

*See In re: COVID-19 Bus. Interruption Protection Ins. Litig.*, MDL No. 2942, 2020 WL 4670700, at *2-3 (J.P.M.L. Aug. 12, 2020) (hereinafter *In re: COVID-19*). Each and every one of these factors applies with equal force to the proposed Lloyd's MDL. Just as the Panel found that regional and state-specific MDLs failed to cure these ills, a Lloyd's MDL suffers from the same defects.

First, a Lloyd's MDL would not involve a single insurer or affiliated insurer group. The Subject Actions against DSA were brought not against one sole defendant but instead against 40 separate insurance syndicates operating within the Lloyd's, London market, two continental insurers—not operating in the Lloyd's market—and two U.S. claims management companies.

Second, the contemplated Lloyd's MDL would involve different types of placements in the London insurance market and outside of it, including open market policies underwritten on a tailored basis with manuscript wordings, and binder policies underwritten pursuant to delegated authority arrangements, in which Lloyd's underwriters (and others) grant authority to underwrite insurance on their behalf to U.S. "coverholders." The result is there are significant variances in policy forms from one Lloyd's market insured to another.

Third, both types of policies involve what can be described as "split market policies" that include not just Lloyd's underwriters but also U.S., U.K. and European insurers which are not in

the Lloyd's market, which are severally liable only for their respective shares of the Policy, and which therefore exponentially add to both the number of defendants and factual differences.

In other words, consolidation of the current Subject Actions would be an unmanageable affair, and the addition of the inevitable subsequent tag-alongs would transform it into an impossible one. The Subject Actions against the Lloyd's market are a microcosm of the actions against the insurance industry at large, which the Panel declined to centralize. *See In re: COVID-19*, 2020 WL 4670700, at *2. In the context of the Lloyd's defendants, a "single insurer" MDL is a complete misnomer. In reality, the proposed "Lloyd's only" MDL would be the equivalent of ordering all shareholders of the various insurance companies listed on the New York Stock Exchange into a single MDL. Simply put, transfer would not achieve the aims of increased efficiency or conservation of resources, and indeed would have the unintended opposite effect. Thus, the Panel should not consolidate or transfer the Subject Actions.

## I.     BACKGROUND

A brief explanation of the Lloyd's of London insurance market is crucial to understanding why a Lloyd's MDL presents the identical issues as the rejected industry-wide MDL and would be contrary to the objectives of Section 1407 transfer and consolidation.

### A.     Lloyd's of London, Open Market, Delegated Authority, and Split Market Policies

Lloyd's of London is not a single insurance company; rather, "it is a market somewhat analogous to the New York Stock Exchange." *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1357 (2d Cir. 1993). Born from Edward Lloyd's coffee house in the late seventeenth century, where individual shipowners gathered to discuss insurance, the modern market structure was created pursuant to the Lloyd's Acts of 1871 and 1982 (UK). *See Underwriters at Lloyd's, London v. Osting-Schwinn*, 613 F.3d 1079, 1083 (11th Cir. 2010) (citing Lloyd's Act, 1871, 34 Vict. C. xxi,

pmbl; Lloyd's Act, 1982 c. 14). Lloyd's of London itself does not insure any risk;  rather members or investors called "Names," who consist of individuals and corporations, finance the market and ultimately insure risks. *Corfield v. Dallas Glen Hills, LP*, 355 F.3d 853, 858 (5th Cir. 2003). Names underwrite insurance through administrative structures called "syndicates," which are organized and operated by "managing agents" that determine guidelines for the syndicate and accept risks on its behalf. *Osting-Schwinn*, 613 F.3d at 1083. The syndicates are administrative structures, similar to unincorporated associations.  *Id.* The Lloyd's market has 93 such syndicates, each underwriting insurance policies unique to their own individual business plans.[2]

A typical Lloyd's policy has multiple syndicates that collectively are responsible for up to 100 percent of the coverage provided by a policy but which only accept several liability on the policy for their percentage shares. *Corfield*, 355 F.3d at 858.[3] Thus, even a "typical Lloyd's policy" could be subscribed to by one or dozens of Lloyd's syndicates, each of which makes its own independent decisions on whether to insure risks. In addition to the subscription nature of the market, which results in the insurers on policies changing from policy to policy, the manner in which the policies are entered into varies. Generally, there are two  types of policy placements of which the Panel should be aware: (1) open market policies, which typically are individually crafted and underwritten with unique manuscript wordings designed solely for that insured's particular risk exposures; and, (2) policies underwritten pursuant to delegated authority arrangements, in which Lloyd's underwriters (and others) grant authority to underwrite insurance on their behalf to U.S. "coverholders." Both types of policies can involve what are best described as "split market

---

[2] *See The Lloyd's Market*, LLOYD'S,  https://www.lloyds.com/about-lloyds/what-is-lloyds/the-lloyds-market  (last visited Aug. 26, 2020).
[3] An example of such a policy is either of the two policies involved in the *El Novillo* lawsuit, to which seven Lloyd's syndicates subscribe. *See El Novillo Rest. v. Certain Underwriters at Lloyd's London*, C.A. No. 1:20-21525, ECF No. 1-2 (S.D. Fla.).

policies" that include not just Lloyd's underwriters but also U.S., U.K. and European insurers that are not members of Lloyd's, which are severally liable only for their respective shares of the policy.

An open market policy is created when a Lloyd's broker, working in conjunction with a U.S. broker, takes a certain risk to representatives of underwriters at Lloyd's and directly shops that risk to them. Those underwriters, if they choose to be on that policy, subscribe to a percentage of the risk on a several liability basis only in accordance with their appetite.[4] By contrast, delegated authority policies are created when a Lloyd's syndicate, or set of syndicates, enters into a delegated authority arrangement with a "coverholder," often an American surplus lines insurance broker, pursuant to which the syndicate(s) conveys authority to the coverholder to underwrite risks on their behalf, so long as they fall within the conditions specified in the delegated authority contract.[5] Open market policies are often drafted by the broker or the insured itself, and therefore, usually contain tailored wordings that are unique to the risk.[6]  Delegated authority policies typically are prepared by the coverholders and can be, but are not always, on ISO forms.[7]  Indeed, from a very limited sampling by the managing agent of just one Lloyd's syndicate, its coverholders write on a variety of ISO but also manuscript wordings that differ materially from the ISO wordings.[8]

Open market policies cover large commercial and reinsurance risks placed by means of an individual negotiated contract, as opposed to one created by a coverholder or that is ceded under a

---

[4] *See generally Glossary and acronyms – Open market business*, LLOYD'S, https://www.lloyds.com/help-and-glossary/glossary/glossary-and-acronyms?Letter=O (last visited Aug. 26, 2020).
[5] *See generally Glossary and acronyms – Binding authority*, LLOYD'S, https://www.lloyds.com/help-and-glossary/glossary/glossary-and-acronyms?Letter=B (last visited Aug. 26, 2020). Frequently, there are one or two layers of brokers working in the space between the insured and the coverholder, one acting solely for the insured, and one acting as an intermediary between the insured's broker and the coverholder. This multiplicity of layers further complicates the discovery process that would exist in a "Lloyd's-only" MDL in the event underwriting evidence were deemed material.
[6] Declaration of Lee Bennett (attached as Exhibit A), ¶ 6.
[7] *Id.* at ¶ 5.
[8] *Id.* Manuscript wording is wording that is specifically tailored to meet the needs of the insured, and thus, is often unique to the risk being undertaken. *Id.* at ¶¶ 5-6.

reinsurance treaty.[9] These are manuscript wordings crafted specifically for that insured, and in the case of reinsurance, an underlying insurer writes a policy. Open market policies are almost always placed not just with Lloyd's underwriters but in the international insurance market with numerous U.S., U.K., Bermudian and European insurance companies having no affiliation whatsoever with Lloyd's.

This leads to a discussion of "split market policies," which are policies on which U.S., Bermudian, U.K. and/or European insurance companies participate for their several shares only alongside Lloyd's syndicates, with each of those companies responsible for their own respective coverage positions. Complicating the scenario further is that the "company market" on those policies may have wordings that are themselves different from not only the wordings used by the subscribing Lloyd's syndicates but also the other companies. The policies at issue in five of the Subject Actions are examples of split market policies, as each policy is underwritten by both Lloyd's syndicates and HDI Global Specialty SE, a German company, or Axis Specialty Europe SE, an Irish company.[10] Another example is *West Flagler Assocs, Ltd. v. AXA XL Ins. Grp*, C.A. No. 1:20-cv-22990, ECF No. 1 n. 1 (S.D. Fla.), in which plaintiff admits that additional insurers, including Lloyd's syndicates that are part of the AmWINS Special Risk Underwriters, LLC program will be added to the suit if coverage is denied. One Lloyd's syndicate, by way of risks underwritten via American coverholders, subscribes to thousands of split market policies insuring risks across the United States, under which a number of factually unique COVID-19 claims are

---

[9] *See generally Glossary and acronyms – Facultative risk*, Lloyd's, https://www.lloyds.com/help-and-glossary/glossary-and-acronyms?Letter=F (last visited Aug. 26, 2020).

[10] HDI Global Specialty SE is a defendant in five of the Subject Actions. *See* D.E. 15-3, p. 56 (schedule of participants on the policy in *Town Kitchen*); *Palm & Pine Ventures, LLC v. Certain Underwriters at Lloyd's London*, C.A. No. 3:20-08212, ECF No. 1, ¶¶ 5-6 (D.N.J.); *MDH Global, LLC v. Certain Underwriters at Lloyd's, London*, C.A. No. 3:20-08214, ECF No. 1, ¶¶ 5-6 (D.N.J.); *SA Palm Beach, LLC v. Certain Underwriters at Lloyd's London*, C.A. No. 9:20-cv-80677-UU, ECF No. 1 (S.D. Fla.); *Atma Beauty, Inc. v. HDI Global Specialty SE*, C.A. No. 1:20-21745, ECF No. 4-1. Axis Specialty Europe SE is a defendant in one of the Subject Actions. *See Atma*, C.A. No. 1:20-21745, ECF No. 4-1.

currently being investigated.[11] Some of these split market policies are co-insuring policies and expressly incorporate the terms, conditions, limitations, and exclusions set forth in policies issued by domestic insurance companies in the United States, which are not part of the Lloyd's market.[12]

Nothing can illustrate the difficulties that would accompany a so-called Lloyd's MDL better than the notable insurance litigation involving the World Trade Center.[13] This litigation involved not only numerous Lloyd's syndicates, but also insurers from all over the world. *See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 118 (2d Cir. 2006) (stating over 20 insurance companies and 20 Lloyd's syndicates participated in the litigation). The central issue was whether the 9/11 attacks constituted one or two occurrences under the subject policies. *Id.* at 117. Notably, a jury verdict was entered in favor of the Lloyd's market, but other carriers remained in litigation for three years after the verdict.[14] Liability turned on the interpretation of the wording contained in a binding form prepared by one of the insurers, which did not contain a restrictive definition of an "occurrence," as was the case with the form used by the Lloyd's market and other prevailing insurers.[15] The Second Circuit, affirming the district court verdicts, stated: "These forms were designed with different interests in mind and, not surprisingly, yielded different results." *SR Int'l Bus. Ins. Co.*, 467 at 140. The large number of insurers from all over the globe and the variations within the litigation demonstrates that a Lloyd's MDL would be utterly unworkable.

## B.    The Pandemic, Government Response, and Business Interruption Litigation

The United States is in the midst of a global pandemic caused by a virus known as "SARS-CoV-2" and the disease the virus causes: COVID-19. This pandemic has caused a race to

---

[11] Exhibit A, ¶ 8.
[12] *Id.* at ¶ 7.
[13] *See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, C.A. No. 1:10-cv-9291, ECF No. 1, Complaint (S.D.N.Y. Oct. 22, 2001), attached as Exhibit B.
[14] *See Jury Rules WTC Attacks Were Two Events; Silverstein Recovery May Double to $2.2 Billion*, INS. J. (Dec. 7, 2004), https://www.insurancejournal.com/news/national/2004/12/07/48289.htm.
[15] *Id.*

courthouses, and the courts are promptly adjudicating these disputes.[16] One of the largest races involves Lloyd's insurers. This is unsurprising, considering that, in 2018, if all Lloyd's underwriters were to be considered one, which they are not, they would have written the largest amount of direct premiums among surplus lines insurers—$11.75 billion, equating to 23.6% of the total United States surplus lines market.[17] Given the size, diversity, and nature of the Lloyd's market's operations, it is unsurprising that these cases involve different policy terms, insure different risks across different industries, and will be subject to the application of the insurance law of a plethora of states.

As previously noted, each COVID-19 business interruption claim is related to the varying orders of different governing bodies, as state governments, counties, and municipalities have each issued their own responsive orders.[18] The resulting regulatory landscape is a patchwork of executive orders affecting the operations of "essential" and "non-essential" businesses across America. The ensuing lawsuits filed by business owners seeking business interruption coverage,

---

[16] Several courts across the nation have begun to issue decisions in these coverage cases, the majority of which support the conclusion that such losses are not covered. *See Diesel Barbershop, LLC v. State Farm Lloyds*, C.A. No. 5:20-cv-461-DAE, 2020 WL 4724305 (W.D. Tex. Aug. 13, 2020) (granting insurer's motion to dismiss); *Soc. Life Magazine, Inc. v. Sentinel Ins. Co.*, C.A. No. 20-cv-3311-VEC (S.D.N.Y. May 14, 2020) (denying insured's motion for preliminary injunction seeking coverage); *The Inns by the Sea v. Cal. Mut. Ins. Co.*, C.A. No. 20-cv-001274 (Cal. Super. Ct. Aug. 6, 2020) (granting insurer's demurrer); *Rose's 1, LLC v. Erie Ins. Exch.*, C.A. No. 2020-CA-002424-B, 2020 WL 4589206 (D.C. Super. Ct. Aug. 6, 2020) (granting insurer's summary judgment motion); *Gavrilides Mgmt. Co. v. Mich. Ins. Co.*, C.A. No. 20-000258-CB (Mich. Cir. Ct. July 1, 2020) (granting insurer's motion for summary disposition). A minority of jurisdictions have decided that these cases could not be resolved at the motion to dismiss stage. *See Studio 417, Inc. v. Cincinnati Ins. Co.*, C.A. No. 20-cv-03127-SRB, 2020 WL 4692385 (W.D. Mo. Aug. 12, 2020); *Optical Servs. USA/JC1 v. Franklin Mut. Ins. Co.*, C.A. No. BER-L-3681-20 (N.J. Super. Ct. Law Div. Aug. 13, 2020). After a recent decision by the 11th Circuit, which may well prove to be a seminal opinion, DSA anticipate an even larger ratio of future decisions will be issued in favor of insurers. *See Mama Jo's Inc. v. Sparta Ins. Co.*, C.A. No. 18-12887, 2020 WL 4782369, at *8 (11th Cir. Aug. 18, 2020) ("[A]n item or structure that merely needs to be cleaned has not suffered a 'loss' which is both 'direct' and 'physical.'").

[17] *See Surplus Lines*, INS. INFO. INST., https://www.iii.org/publications/a-firm-foundation-how-insurance-supports-the-economy/driving-economic-progress/surplus-lines (last visited August 26, 2020). As surplus insurers, Lloyd's underwriters are not required to use forms approved by each state's department of insurance, and instead can write policies as they deem fit, increasing the likelihood that the subject policies will be different. *See* Denise Johnson, *Understanding the Differences Between Standard & Excess/Surplus Lines*, CLAIMS J. (July 31, 2014), https://www.claimsjournal.com/news/national/2014/07/31/252642.htm.

[18] *See* Sarah Mervosh et al., *See Which States and Cities Have Told Residents to Stay at Home*, NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html (last visited August 26, 2020).

of which there are now hundreds, span the nation and involve both domestic insurers and foreign insurers, such as DSA. As a result, there are a virtually unlimited number of variables.

The Panel recognized this immense factual variation and the challenges that would accompany a multidistrict litigation in its *In re: COVID-19* decision, where it denied an attempt by policyholders to consolidate these lawsuits on an industry-wide basis. The Panel stated that "the MDL that movants request entails very few common questions of fact, which are outweighed by the substantial convenience and efficiency challenges posed by managing a litigation involving the entire insurance industry." *In re: COVID-19*, MDL No. 2942, 2020 WL 4670700, at *3 (J.P.M.L. Aug. 12, 2020). These efficiency challenges involved requiring a transferee court to "establish a pretrial structure to manage the hundreds of plaintiffs—many with disparate views of the litigation—and more than one hundred insurers." *Id.* at *2. In addition, the Panel rejected "slicing" the cases by region or state, concluding that other than paring down the total number of cases in each MDL, the factors dissuading against establishing an MDL on a national basis applied with equal force on  a regional or state basis. *Id.* at *3.

However, the Panel posited that limiting an MDL to a "single insurer or group of related insurers . . . would not entail the managerial problems of an industry-wide MDL involving more than a hundred insurers." *Id.* at *3.[19] Consolidation by insurer, the Panel theorized, could ideally be "more likely to involve insurance policies utilizing the same language, endorsements, and exclusions." *Id.* As a result, an "insurer-specific" MDL could supposedly "achieve the convenience and efficiency benefits envisioned by Section 1407," and the Panel requested additional briefing from several insurers to test this inquiry. *Id.* Respectfully, "slicing" the cases into a Lloyd's MDL

---

[19] While the Panel referred to "Certain Underwriters at Lloyd's, London" as a "group of related insurers," the structure of the Lloyd's market and the facts set forth in this brief demonstrate otherwise.

suffers from the same flaws as the proposed regional and state-specific MDLs, and the hypothetical potential benefits of a Lloyd's MDL, as articulated in the Order, are demonstrably unobtainable.

## II.   <u>ARGUMENT</u>

The Subject Actions and inevitable subsequent tag-along actions do not share sufficient common questions of fact to warrant consolidation. The creation of a Lloyd's MDL will reduce judicial efficiency and delay resolution of the predominately legal issues looming over these actions, at the expense of both policyholders and insurers. Under 28 U.S.C. § 1407, the Panel considers three factors when determining whether to transfer and consolidate pretrial proceedings: (1) whether the actions involve "one or more common questions of fact;" (2) whether the transfer would be for "the convenience of parties and witnesses;" and (3) whether the transfer would "promote the just and efficient conduct of such actions." These factors, and the rationale set forth in the *In re: COVID-19* decision suggesting the creation of insurer-specific MDLs, do not align with the realities of a Lloyd's MDL. To the contrary, all of the rationale set forth in the *In re: COVID-19* decision for *refusing* industry-wide centralization are directly applicable here. Specifically, there are two primary reasons a Lloyd's MDL is inappropriate.

First, a Lloyd's MDL would not resolve the managerial concerns the Panel correctly expressed regarding insurance industry-wide centralization. Given the immense impact of the COVID-19 pandemic on American business owners and the sizable number of risks insured through the Lloyd's market, it is evident that the Subject Actions are only the tip of the litigation iceberg. This litigation will, and indeed already has, looped in non-Lloyd's insurers which subscribe alongside certain Lloyd's syndicates to split market policies. Critically, the policies at issue thus far in the Subject Actions involve delegated authority policies only. The layers of complexity and diversity that will result when litigation over open market placements becomes

intertwined in a "Lloyd's only" MDL increase even more dramatically given the far higher number of U.S., U.K., Bermudian and European insurers which participate in significant several shares on those risks, as demonstrated by the *SR Int'l Bus. Ins. Co.* litigation. This is particularly the case considering that those insurers speak for themselves on claim decisions and often have separate policies with different wordings on the same risk. Thus, a Lloyd's MDL would not involve "a single insurer or group of related insurers," but instead would present all of the complications of industry-wide centralization.

Second, the Subject Actions and subsequent tag-along actions do not contain sufficient common questions of fact and are predominated by questions of law. The subject policies in a Lloyd's MDL would vary greatly from insured to insured. The policies involve different types of coverages and contain a vast array of terms, conditions, endorsements, exclusions, and limitations. Moreover, these policies would all involve different businesses in different industries, located in different states that issued different government orders in response to the pandemic, and the policies' terms would be underwritten by coverholders located throughout the United States and governed by the laws and regulations of those different states. Accordingly, DSA oppose consolidation of the Subject Actions and the creation of a Lloyd's MDL.

### A.   A Lloyd's MDL Would Not Involve a Single Common Defendant and Would Inhibit Judicial Efficiency

When determining whether transfer to one venue promotes judicial efficiency, the Panel looks to whether a Section 1407 transfer would satisfy four objectives: (1) the elimination of duplicative discovery; (2) the avoidance of conflicting rules and schedules; (3) the reduction of litigation costs; and (4) the conservation of the time and effort of the parties, attorneys, witnesses, and courts. *See In re AOL Time Warner, Inc.*, 235 F. Supp. 2d 1380, 1381 (J.P.M.L. 2002). Even a cursory examination demonstrates that consolidation of the Subject Actions and subsequent tag-

along actions would not serve these interests. Instead, a Lloyd's MDL would exacerbate the very problems that insurer-specific MDLs are hypothesized to resolve.

The Panel previously refused industry-wide centralization in part because there was "no common defendant in these actions," and thus, "there is little potential for common discovery across the litigation." *In re: COVID-19*, MDL No. 2942, 2020 WL 4670700, at *2 (J.P.M.L. Aug. 12, 2020). This same logic applies here. If a Lloyd's MDL were created, it would necessarily involve actions brought against a substantial number of independent Lloyd's syndicates, and therefore, a great number of defendants. *See, e.g.*, *Ind. Gas Co. v. Home Ins. Co.*, 141 F.3d 314, 317 (7th Cir. 1998) (stating that "[e]ither the active underwriters or the syndicates are the right parties" as opposed to the individual Names underwriting the policy). While parties in support of a Lloyd's MDL may try to frame the issue differently, there would be no common single defendant, or affiliated group, here. Across the Subject Actions against DSA alone, the most actions one syndicate is involved in is nine.[20] Meanwhile, two of the 40 named Lloyd's syndicates and one non-Lloyd's insurer are defendants in only one of these actions.[21] Lloyd's is not a monolithic institution; it is a market comprised of dozens of independent, unrelated entities.

Accordingly, a Lloyd's MDL would involve a wide array of defendants that subscribe to a wide variety of insurance policies issued to an incredibly diverse group of insureds, insuring different risks in different states. This lack of commonality inhibits judicial efficiency and disfavors transfer. *See, e.g.*, *In re Hotel Indus. Sex Trafficking Litig.*, 433 F. Supp. 3d 1353, 1356 (J.P.M.L. 2020) (denying transfer because "there is no common or predominant defendant across all actions, further indicating a lack of common questions of fact"); *In re: Victoria's Secret Undergarments/Intimate Apparel Prods. Litig. Liab.*, 626 F. Supp. 2d 1349, 1350  (J.P.M.L. 2009)

---

[20] BRT 2987.
[21] SKD 1897, CPPP 9981, and Axis Specialty Europe SE.

("Victoria's Secret sells a vast array of brands, styles, and colors of undergarments . . . manufactured by various factories with components from various suppliers. Therefore, it is likely that discovery will vary among the actions."). Additionally, while DSA are represented by one law firm here, Lloyd's underwriters in other actions are represented by other counsel and may desire those additional attorneys to appear in a Lloyd's MDL, as each Lloyd's syndicate and insurance company on a policy along with Lloyd's underwriters has the right to appoint its own counsel.

Moreover, the inclusion of split market policies would result in an untold number of domestic and foreign insurers becoming participants in a "Lloyd's only" MDL. This is not a theoretical concern; five of the Subject Actions already involve split market policies, demonstrating an emerging pattern. The inevitable inclusion of non-Lloyd's defendants would cause the already large number of defendants to grow, exponentially increasing case management concerns. Any attempt to carve-out these insurers from a Lloyd's MDL would be futile, as split market policies necessarily involve both Lloyd's and non-Lloyd's insurers. Thus, if these insurers were excluded from a Lloyd's MDL, and litigation on the claim as to those insurers instituted elsewhere, Lloyd's underwriters on split market policies would be subject to decisions on a variety of issues, likely before the slower-moving MDL could reach its own decisions. Conversely, those other insurers would need to consider attempting to intervene in the Lloyd's MDL so that they could have the opportunity to defend themselves in coverage litigation directly impacting their interests. Either way, the purpose for creating a Lloyd's only MDL would be defeated, and very well could lead to multiple pieces of litigation on but a single policy and potentially inconsistent results as to the same insured under a single policy. *See, e.g.*, *In re Sterling Fin. Corp. Secs. Litig.*, 528 F. Supp. 2d 1353, 1354 (J.P.M.L. 2007) (stating centralization was warranted to "prevent

inconsistent rulings on pretrial motions, especially with respect to class certification; and conserve the resources of the parties, their counsel and the judiciary").

Not only does the number of defendants increase exponentially once split market policies are considered, but this would also result in an unusually large number of defendants competing in overlapping insurance markets being consolidated into one MDL. The Panel has stated that it disfavors consolidation in such situations. *See In re Power Morcellator Prod. Liab. Litig.*, 140 F. Supp. 3d 1351, 1353 (J.P.M.L. 2015) ("We have held that we are typically hesitant to centralize litigation against multiple, competing defendants which marketed, manufactured, and sold [allegedly] similar products.") (internal quotations omitted). This Panel has also generally recognized that overbroad consolidation is inappropriate in insurance litigation matters. *See, e.g.*, *In re: The Great W. Cas. Co. Ins. Litig.*, 176 F. Supp. 3d 1371, 1372 (J.P.M.L. 2016) ("We cannot centralize all claims in which a particular insurer denies coverage . . . .").

The lack of commonality among defendants is already evident from the Subject Actions against DSA, which involve 40 separate insurance syndicates operating within the Lloyd's market, two non-Lloyd's defendants that are participants on five split market policies, and two claims management companies. Just as this Panel has recognized that industry-wide centralization is inappropriate, it should recognize that Lloyd's-market-wide centralization suffers from the exact same issues. *See In re: Mortgage Lender Force-Placed Ins. Litig.*, 895 F. Supp. 2d 1352, 1354 (J.P.M.L. 2012) (denying industry-wide centralization because cases involved "not only different defendants but different lender agreements with insurers, different alleged abuses, and different mortgage loan documents"); *In re: Tropicana Orange Juice Marketing & Sales Practices Litig.*, 867 F. Supp. 2d 1341 (J.P.M.L. 2012) (denying industry-wide centralization because cases

involved "different products . . . and different putative class actions of consumers who purchased each product").

The Subject Actions and subsequent tag-along actions will involve different insurance policies, with different terms, conditions, exclusions, and endorsements. A Lloyd's MDL would complicate, not alleviate, case management.[22] Thus, if the Panel seeks to promote efficiency and convenience, it should refrain from consolidating these actions, which would only increase litigation costs and require parties, attorneys, witnesses, and courts to exert needless effort.[23]

**B.      A Lloyd's MDL Would Involve Innumerable Policy Variations that Outweigh Any Common Factual Issues**

The Subject Actions involve "different insurance policies with different coverages, conditions, exclusions, and policy language, purchased by different business in different industries located in different states." *In re: COVID*-19, 2020 WL 4670700, at *2. These same commonality issues that plagued the original effort to centralize COVID-19 business interruption claims industry-wide would plague a Lloyd's MDL. Without sufficient common questions of fact, transfer is inappropriate. *See In re Not-For-Profit Hosp./Uninsured Patients Litig.*, 341 F. Supp. 2d 1354, 1356 (J.P.M.L. 2004) ("Notwithstanding the numerosity of actions, movants have failed to persuade us that these actions share sufficient common questions of fact to warrant Section 1407

---

[22] Any concern about overlapping discovery, such as, for instance, the availability of epidemiological expert witnesses, is also not sufficient to warrant consolidation. Instead, there are suitable alternatives to Section 1407 transfer that are available to resolve these concerns. For instance, notices for the depositions of such experts could be filed in multiple relevant actions, making the deposition applicable across all of these actions, or parties could stipulate that certain discovery relevant to multiple actions may be used in all such actions. *See In re Eli Lilly & Co. (Cephalexin Monohydrate) Patent Litig.*, 446 F. Supp. 242, 244 (J.P.M.L. 1978). Since the Subject Actions concern questions of law particular to each state, insurance policy, and industry, consultation and cooperation among federal district courts in each state "would be sufficient to minimize the possibility of conflicting pretrial rulings." *Id.*

[23] The lack of commonality across insurers is yet another of the many factual disparities among the Subject Actions that would cause procedural inefficiencies. As recognized by United Policyholders: "Both MDL and class actions have existing, time-tested rules and procedures, none of which is appropriate for [consolidation of COVID-19 insurance disputes] for a number of reasons, including the lack of commonality." (UP Amicus Brief, attached as Exhibit C, p. 9). To this point, United Policyholders argued that consolidation would unfairly disregard policyholders' strategic preferences. Essentially, consolidation would "discount the uniqueness of each policy's contractual language to the detriment of policyholders and insurance companies." (*Id.* at p. 12).

transfer."). Furthermore, when "questions of law rather than common questions of fact are significantly preponderant," Section 1407 transfer is unwarranted. *In re U.S. Navy Variable Reenlistment Bonus Litig.*, 407 F. Supp. 1405, 1406 (J.P.M.L. 1976). Here, the few commonalities among the Subject Actions are "far outweighed by the unique facts and legal issues presented by each case," making Section 1407 transfer and consolidation inappropriate. *In re: the Great West Cas. Co. Ins. Litig.*, 176 F. Supp. 3d 1371, 1372 (J.P.M.L. 2016).

### 1.      A Lloyd's MDL Would Involve Insufficient Common Questions of Fact

In a Lloyd's MDL, each plaintiff will still have its own insurance policy with different terms, conditions, limitations, exclusions, and endorsements and will have been subject to innumerable variables in state and municipal orders. Indeed, the nature of the class members' businesses will vary extremely between essential and non-essential under each local and/or state order, between brick and mortar and teleworking compatible, between those that pre-emptively closed and those whose closure was forced, and between those that simply saw a drop in business due to market conditions. Therefore, like the COVID-19 claims industry-wide, the Subject Actions and subsequent tag-along actions will possess no more than a "superficial commonality," which is a situation that this Panel has recognized not to warrant consolidation. *In re: COVID-19*, 2020 WL 4670700, at *2; *see also In re Fla., P.R., & U.S.V.I. 2016 & 2017 Hurricane Seasons Flood Claims Litig.*, 325 F. Supp. 3d 1367, 1368–69 (J.P.M.L. 2018) (denying consolidation for various claims arising out of hurricane damage because each case "necessarily involves a different property, different insureds, different witnesses, different proofs of loss, and different damages").

This lack of factual commonality is evident from the current record. The Subject Actions involve restaurants, bars, beauty and hair salons, vacation rental companies, and a homeowner operating a bed and breakfast. These risks are located in nine different states. Further, the

16

difference in policy wording is evident from just the policies involved in the Subject Actions. For example, the policies at issue in *El Novillo Rest.*, *Atma Beauty, Inc*., and *Sun Cuisine* contain a "Microorganism Exclusion,"[24] which is absent from the *Gio Pizzeria & Bar Hosp., LLC* policies, as well as the *Palm & Pine Ventures* and *MDH Global, LLC* policies.  Meanwhile, the *SA Palm Beach, LLC*, *Station 6, LLC*, and *Juan's Hair Salon* policies have an exclusion for "organic pathogens,"[25] which is not found in the other at-issue policies. *Fire Island Retreat* involves a homeowners policy with significantly different terms, including the absence of a "Pollution and/or Contamination and/or Seepage" exclusion that is present in the other at-issue policies.[26] *RJH Mgmt. Corp.* involves an entirely different type of coverage known as contingency, is not on ISO forms, and includes coverage for a "Pandemic Event."[27] Still, despite involving a different form of coverage, and thus, different legal issues, *RJH Mgmt. Corp* and subsequent cases like it would be lumped into the broad MDL proposed here without regard to the variations in policy forms used by the Lloyd's market and implicated by a Lloyd's only MDL.

Though policyholders assert that the subject policies will provide or exclude coverage under a limited number of similar or identical forms, variations of "similar" forms can contain significant discrepancies, which will lead to inevitable arguments over the meaning of the differences. For example, some of the policies in the Subject Actions provide business income coverage for a "suspension" caused by "direct physical loss *of* or damage to" covered property,[28] while others provide business income coverage for a "suspension" caused by "direct physical loss *to*" covered property.[29] At least one plaintiff in the Subject Actions has argued that the use of "of"

---

[24] *See* Exhibits D, E & F, Form LMA 5018.
[25] *See* Exhibits G & H Form GSC-CP-007 (09/07); Exhibit I Form PM-CP-007 (06/16).
[26] *See* Exhibit J.
[27] *See* Exhibit K, TNR Policy Form 02-17.
[28] *See, e.g.*, Exhibit F, Form CP 00 30 10 12, p. 1 of 9.
[29] *See, e.g.*, Exhibit L, Form PI 200 (02/15), p. 1 of 5.

instead of "to" in this context is a meaningful distinction.[30] Other plaintiffs have argued that the decision to omit certain forms from one policy to the next has a hidden meaning, changing the interpretation of other policy provisions.[31] If the change of a single preposition or the decision to include one endorsement over another can be argued to create different results, the number of possible permutations is endless, and each variation—no matter how small—demonstrates the difficulties with consolidation. Beyond the Subject Actions, the variations are even more numerous, considering the doubtless variations in both ISO and non-ISO wordings.[32]

Any commonalities shared by Lloyd's policies would be even further diluted by the inclusion of open market and delegated authority policies. For example, in regard to delegated authority policies, there are approximately 3,950 approved Lloyd's coverholder office locations, which means there are thousands of different coverholders crafting policies subscribed to by Lloyd's insurers.[33] The amount of work required to appropriately group these policies by common language and then by state would paralyze any court. Without further detailing the differences between these policies, DSA urge the Panel to recognize that the policies at the core of the Subject Actions contain varying terms, conditions, exclusions, and endorsements, and therefore, the

---

[30] *See Atma Beauty, Inc. v. HDI Global Specialty SE*, C.A. No. 1:20-cv-21745, ECF No. 20, p. 20 (S.D. Fla.) ("Critically, because the phrase uses the disjunctive 'or,' the Policy's all-risk coverage may be triggered *either* by 'loss' *or* by 'damage.'") (emphasis in original).

[31] *See, e.g.*, *El Novillo Rest. v. Certain Underwriters at Lloyd's London*, C.A. No. 1:20-cv-21525-UU, ECF No. 29, p. 3 n. 3 (S.D. Fla.) ("Defendants' election not to apply [the 'virus exclusion set forth in ISO form CP 01 40 07 06] in Plaintiffs' policies reflects a lack of intent to exclude virus-related claims from coverage.").

[32] The Baker Affidavit deployed in support of the efforts for an industry-wide MDL (attached as Exhibit M), in addition to the flaws identified in the first round of briefings, is further flawed in that it is predicated upon only wordings identified in lawsuits filed, not to be filed. One could posit that the suits filed in fact have been strategically selected to show commonality of policy wording. Whether or not that is the case, it will become abundantly clear that there are multitudes of policy forms at use solely within the Lloyd's market, stemming in large part from the vast number of coverholders throughout the U.S. that place insurance on the market's behalf and also the manuscript broker-draft wordings for open market risks.

[33] *The Lloyd's Market*, LLOYD'S, https://www.lloyds.com/about-lloyds/what-is-lloyds/the-lloyds-market (last visited Aug. 26, 2020). While this number of coverholders is not restricted to the United States market, over 40% of Lloyds' global premiums are held by United States customers, indicating there are, at the very least, over a thousand approved Lloyd's coverholders in the United States. *See About Lloyd's of London in the US*, LLOYD'S, https://www.lloyds.com/lloyds-around-the-world/americas/us-homepage/about-us (last visited Aug. 26, 2020).

Subject Actions contain very few factual commonalities.

Even where the policy language is substantially similar, differences remain that make an MDL unworkable. For example, where the policies provide Business Income coverage for a "suspension" of your "operations" "caused by direct physical loss of or damage to property" the plaintiffs disagree as to what constitutes such physical loss or damage. Some argue that the government orders themselves, which impacted their business operations, are physical loss or damage to the insured property,[34] while others argue that it is the presence or potential presence of the virus that caused physical loss or damage to the insured property.[35] Accordingly, while some plaintiffs may want epidemiolocal evidence on the "physical loss or damage," to show that the virus was present, others will not. While both arguments have already been rejected by most courts,[36] these inconsistent positions support rejection of an insurer-specific MDL as they show a further lack of common factual issues.

Lastly, the defenses across all of these actions will vary as well. For example, *Fire Island Retreat* may involve a potential misrepresentation by the plaintiff insured, who is seeking to recover lost business income from a bed and breakfast run out of his residence, despite not disclosing his business operations on the policy application. As another illustration, the plaintiffs in *Juan's Hair Salon* and *King's Palace* assert bad faith claims, and the defenses to these claims will be unique compared to a breach of contract claim.[37] This is even more evidence of the factual

---

[34] *See El Novillo Rest. v. Certain Underwriters at Lloyd's, London*, C.A. No. 1:20-cv-21525-UU, ECT No. 29, p. 12 (S.D. Fla.) ("Plaintiffs do not allege that the novel coronavirus was present in their restaurants.").
[35] *See* D.E. 37, pp. 1-2.
[36] 10A Couch on Ins. § 148:46 (3d ed. 2020) ("The requirement that the loss be 'physical' given the ordinary definition of that term is widely held to exclude alleged losses that are intangible or incorporeal . . . preclude[ing] any claim . . . when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of property.").
[37] *Juan's Hair Salon v. Certain Underwriters at Lloyd's, London*, C.A. No. 3:20-cv-01527-CAB-AGS, ECF No. 1 ¶ 90-100 (S.D. Cal.); *King's Palace, Inc. v. Certain Underwriters at Lloyd's, London*, C.A. No. 2:20-cv-02629-TLP-cgc, ECF No. 1 ¶¶ 150-56 (W.D. Tenn.).

peculiarities surrounding each of these claims.

### 2. Questions of Law, Not Fact, Would Predominate a Lloyd's MDL

Just as questions of law would predominate in an industry-wide MDL, they would predominate in a Lloyd's MDL as well, because the heart of every action is whether the plaintiff's policy terms, varied as they may be, provide coverage for the plaintiff's business interruption claim under the applicable state law. For that reason, DSA incorporate by reference the predominance argument asserted in their original opposition to an insurance-wide MDL.[38]

In short, the factual differences across the Subject Actions are numerous and will continue to grow as subsequent tag-along actions emerge with additional Lloyd's underwriters and varied policy language. The central issue of each action will be one of contract interpretation. Many of the Subject Actions are putative nationwide class actions, and thus, a Lloyd's MDL could therefore involve breach of contract cases under the common laws of each of the fifty states and each territory, which raises an immense number of legal questions.[39] Based on the current record, the few commonalities among the Subject Actions are outweighed by the unique facts and predominant legal issues, making the Subject Actions unfit for Section 1407 transfer and consolidation. The scale will only tilt further towards denying consolidation as more actions are filed against Lloyd's insurers, adding to the already immense pile of factual variables.

## III.   **CONCLUSION**

A Lloyd's MDL would be fraught with all of the complications of the rejected industry-wide centralized action and consolidation of the Subject Actions is inappropriate under 28 U.S.C. § 1407. Accordingly, DSA oppose consolidation and transfer of the Subject Actions as well as the creation of a Lloyd's MDL.

---

[38] *See In re: COVID-19*, MDL No. 2942, ECF No. 450, pp. 5-10 (J.P.M.L.), attached as Exhibit N.
[39] Just among the 16 Subject Actions involving DSA, DSA contend that the law of nine different states apply.

Dated: August 26,  2020

Respectfully submitted,

/s/ Paul L. Fields Jr.
Paul L. Fields, Jr.

**FIELDS HOWELL LLP**
**ATTORNEY FOR DEFENDANTS**
1180 W. Peachtree Street NE,  Suite 1600
Atlanta, Georgia  30309
Telephone:  (404) 214-1250